STATE ex rel. UNIVERSITY OF UTAH v. CAND-
LAND et al., State Board of Land Commissioners.

No. 2057. Decided September 22, 1909 (104 Pac. 285).

1. CONSTITUTIONAL LAW—MANDAMUS—DUTIES — UNCONSTITUTIONAL
ACT—RIGHT TO QUESTION. Where an officer, though acting min-
isterially, is directly responsible for his official acts, he may
attack a statute directing him to act as unconstitutional, and
justify his refusal in a mandamus proceeding on that ground.
(Page 417.)

2. MANDAMUS—SCOPE OF PROCEEDING—OFFICIAL ACTS. Where an act
has been performed by an officer in accordance with a par-
ticular law, mandamus is not maintainable to compel the officer
to undo what he has done, on the theory that the law is un-
constitutional.1 (Page 418.)

1 Maxwell v. Burton, 2 Utah 295.

3. STATUTES—TOTAL INVALIDITY—EFFECT. A legislative act, which is in conflict with the Constitution, is of no force or effect, and confers no rights, imposes no duties, and affords no protection for acts done thereunder. (Page 418.)

4. CONSTITUTIONAL LAW — STATUTES — VALIDITY—DETERMINATION— PROCEEDINGS. A court cannot properly refuse to pass on the constitutionality of a law requiring a ministerial officer to act, in any proceeding where the question is properly presented, and to which the officer is a party; the officer's interest in complying with his oath of office and in obeying the Constitution, and his desire to avoid liability for damages to an injured party by the enforcement of the law, being sufficient.2   (Page 419.)

5. COLLEGES AND UNIVERSITIES—CONSTITUTIONAL PROVISIONS. Utah Enabling Act (Act Cong. July 16, 1894, c. 138, 28 Stat. 109), section 8, granting lands to the state of Utah for a university, provides that the proceeds of the sale thereof shall constitute permanent funds to be invested and held by the state and the income to be used for the university, and section 10 declares that the proceeds of lands granted for educational purposes, except as otherwise therein provided, shall constitute a permanent school fund, the interest of which only should be expended to support the schools. *Held*, that the general provisions of section 10 were not intended to apply to the proceeds derived from the sale of university lands, which were entirely governed by section 8.   (Page 421.)

6. CONSTITUTIONAL LAW—DETERMINATION OF QUESTION—REASONABLE DOUBT. A court should not declare a statute unconstitutional, if it entertains a reasonable doubt on such question.3   (Page 423.)

7. EVIDENCE—JUDICIAL NOTICE—STATE RECORDS. The Supreme Court may take judicial notice of the estimated income from university land sales for the years 1909, 1910, as contained in the last biennial report of the board of regents of the university to the Governor.   (Page 426.)

8. STATES—STATE DEBTS—DEBT LIMIT—EXCESS—VALIDITY OF STATUTE—"SHALL NEVER CONTRACT ANY INDEBTEDNESS." Utah Laws 1909, p. 335, c. 124, section 1, authorized the regents of the university to expend $250,000 for a central building, and section 2 directed the State Board of Land Commissioners to convert sufficient investments of the Utah University permanent land fund into cash, and pay the same over to the university as a loan, until such payments equaled $250,000, provided that

2 Thoreson v. State Board of Examiners, 19 Utah 30, 57 Pac. 175; 21 Utah 187, 60 Pac. 982, modified and overruled.

3 Edler v. Edwards, 34 Utah 13, 95 Pac. 367.

the loan should be a debt of the university and not of the state, and that the interest on such land fund should be paid to the university, as before, for its general maintenance. Section 6 declared that the regents were authorized to pay out of the funds, appropriated or otherwise available, for its general maintenance, the principal and interest of such obligations as they became due. *Held*, that such indebtedness was in fact the indebtedness of the state, notwithstanding the legislative declaration to the contrary, and that the law was therefore in violation of Const., art. 14, secs. 1, 2, providing that the state shall never contract any indebtedness in excess of $250,000, except to repel invasions, etc.; the phrase "shall never contract any indebtedness" including any obligation which the state undertakes or is obligated to pay out of the future appropriations derived from an exercise of the state's power of taxation. (Page 427.)

Application for mandamus by the state on the relation of the Utah University against W. G. Candland and others, constituting the State Board of Land Commissioners.

WRIT DENIED.

*C. S. Varian* for plaintiff.

*A. R. Barnes,* Attorney-General, for defendants.

FRICK, J.

This is an original application to this court by which the University of Utah, hereafter designated plaintiff, prays for a writ of mandate against the State Board of Land Commissioners to compel said board, hereafter styled defendant, to comply with the provisions of a certain act, designated as chapter 124, passed by the legislature of the State of Utah in 1909. (Laws Utah 1909, p. 335.) An alternative writ was duly issued, to which the defendant appeared by filing a general demurrer to the application for a writ. The application for a writ is based upon the provisions of the act aforesaid, which is as follows:

"Sec. 1. The regents of the University of Utah are hereby authorized and directed to expend two hundred and fifty thousand dollars, or so much thereof as may be necessary to erect a central building on the University campus, and to do all acts and things necessary to accomplish such purpose.

"Sec. 2. The State Board of Land Commissioners is hereby authorized and directed to convert sufficient investments of the University of Utah permanent land fund into cash and at once to pay the same, as well as all cash on hand or that may hereafter be received, belonging to such fund as a loan, until such payments shall equal two hundred and fifty thousand dollars: Provided that such loan shall be a debt of the University of Utah, and not of the State of Utah. ·

"The interest on such land fund shall be paid as heretofore to the University of Utah for its general maintenance.

"Sec. 3. Whenever money is loaned from said University of Utah permanent land fund as herein provided, it is an investment thereof and a loan only, to be repaid as specified in this act.

"Sec. 4. Whenever money is paid to the University of Utah from the University of Utah permanent land fund, as herein provided, then the University of Utah, by its chairman and secretary, shall execute and deliver to the State Board of Land Commissioners, the following obligations, correctly and appropriately filling the blanks, to wit:

"Salt Lake City, Utah, ————.

"$————

"On or before ———— the University of Utah promises to pay to the State Board of Land Commissioners, or its successors, or such officer as may be designated by law, ———— dollars, for the benefit of the University of Utah permanent land fund, together with interest from date until paid, at five per cent. per annum, interest payable January 1st and July 1st of each year.

"University of Utah,
"By ————.
"Chairman of the Board of Regents of the
University of Utah,
"By ————.
"Secretary of the Board of Regents   of the
University of Utah.

"Sec. 5. In executing such obligation the sums first aggregating twelve thousand five hundred dollars, with interest thereon, shall be made payable on or before January 1, 1912. The next sums aggregating twelve thousand five hundred dollars, with interest thereon, shall be made payable on or before January 1, 1913; and so on, making each payment for twelve thousand five hundred dollars, with interest payable one year later than the preceding payment.

"Sec. 6. That the Board of Rogents of the University of Utah are authorized and empowered to pay out of the funds appropriated,

.or otherwise available, for its general maintenance, the principal
and interest of the said obligations as they become due.

"Sec. 7.   All officers, so far as pertains to their respective of-
ficial duties, are hereby empowered with the necessary authority
to carry out the provisions of this act, and are hereby directed
so to do.

"Sec. 8.   All laws in conflict herewith shall be construed so as
to carry out the provisions of this act."

The general demurrer, among other things, is grounded
upon the claim that the aforesaid act "is in conflict with
the provisions of section 5 of article 10 of the Constitu-
tion and section 1 of article 14 of the Constitution, and,
further, that it is in direct conflict and contrary to the pro-
visions of section 8 of the enabling act." In the brief and
argument by counsel upon the demurrer other sections of
the Constitution are also referred to, which, it is asserted,
are violated by the provisions of the act in question.

Before proceeding to a discussion of the constitutional
questions raised by the defendant, it becomes necessary to
dispose of a preliminary question insisted upon by counsel
for the plaintiff, namely, that in the law in question,
which imposes certain duties upon the members constituting
the defendant, nothing is left to their judgment or discre-
tion; that they "have no interest in the controversy;" and
that "the state by its legislature, through and by means of
this law regularly enacted, is dealing with its own prop-
erty;" and hence, it is urged, the defendant will not be per-
mitted to justify nonperformance of the provisions of the
law by the mere claim that the law offends against the Con-
stitution.   In other words, it is contended that the mem-
bers composing the defendant, under the law in question,
are merely ministerial officers discharging a ministerial
duty, and hence have not such an interest in the subject-
matter of the proceeding as to entitle them to refuse to
comply·with the provisions of the law upon the sole ground
that it is unconstitutional. This proposition, it is contended
by plaintiff's counsel, "has been squarely decided by this
court" in the case of *Thoreson v. State Board of Exam-*

*iners*, 19 Utah 30, 31, 57 Pac. 175, and 21 Utah 187, 60 Pac. 982. It may be said that the question was also referred to in the case of *State v. Standford*, 24 Utah 163, 66 Pac. 1061. The Thoreson Case was also mentioned by this court in *State v. Cutler*, 34 Utah 99-107, 95 Pac. 1071, 1074. But it will be observed that in the latter case we carefully avoided expressing an opinion upon the question now raised. While we concede that the court, in the opinion in the Thoreson Case, uses language that supports plaintiff's contention, and that this is likewise true of the language used by Mr. Justice Baskin in the dissenting opinion in the Standard Case, yet, in view of the manner in which the question was presented on the first hearing of the Thoreson Case, we entertain serious doubts upon the proposition whether that case is an authority upon the precise point now raised by counsel for plaintiff. Since the Attorney-General, as counsel for the defendant, strenuously contends that the decision in the Thoreson Case, as construed by plaintiff's counsel, is unsound, and because the question is one of compelling importance, we have concluded to re-examine the question upon both grounds, namely: (1) Whether the question was really involved in the Thoreson Case; and, if this be so, (2) whether that decision should be followed.

We have been unable to find the briefs of counsel filed on the original hearing in the Thoreson Case. We have, however, found the briefs of both sides filed in support of and against the petition for a rehearing in that case. From the reporter's statement of the case, which precedes the opinion of the court in 19 Utah 19, 57 Pac. 175 *et seq.*, and from what is contained in the brief upon the petition for a rehearing, we have been enabled to determine, in a general way at least, the precise questions involved in the Thoreson Case upon which the court was necessarily required to pass judgment in deciding the case. These questions, in substance, were as follows: In 1892 the territorial legislature passed an act (Laws Utah 1892, p. 95, c. 76) authorizing the leasing of the territorial school lands. This

act was declared invalid by the territorial Supreme Court in *Burrows v. Kimball,* 11 Utah 149, 41 Pac. 719. Pursuant to this decision the legislature of the State of Utah adopted section 963, Revised Statutes 1898. By the provisions of this section, the state board of examiners was directed to audit and allow to all claimants the amounts paid by them upon leases of school land entered into under the law which was held invalid in *Burrows v. Kimball, supra.* As will be seen by reference to the Thoreson case, the state board of examiners audited and allowed only a part of what it conceded had been paid by Thoreson under the law, which was declared void, and it based its refusal to allow the whole claim upon the ground that only that portion which was allowed had been paid into the state treasury by the county clerk, to whom Thoreson had paid the full amount claimed by him. In this connection it was claimed by the Attorney-General, who represented the state board of examiners in the Thoreson case, that if said board were authorized to pay any money at all, which he denied, that the proper construction of section 963, *supra,* authorized the board to audit and allow only that portion of the money paid by Thoreson upon the void leases which was received by the state treasury, and, if a construction were placed on said section contrary to said contention, then the section would be unconstitutional. The langauge of the Attorney-General in his brief clearly is to this effect. He says: "We desire to again say that the board has never contended that section 963 is necessarily unconstitutional, but we do contend that the construction asked for by the respondent (Thoreson) would render it so." The principal defense relied on by the Attorney-General in the Thoreson Case, however, in effect, was that since the law under which Thoreson paid his money was invalid—that is, of no force or effect—therefore the state officials never received any of Thoreson's money in their official or legal capacity, but the payment by Thoreson upon the leases was in effect a mere voluntary payment on his part to the officers, as individuals, and they held the money as such and not as offi-

cers of the state; and hence Thoreson should be required to look to them as individuals for the repayment of his money, and not to the state, which had not and could not legally have received it. It is in this connection that the Attorney-General contended that, since the law of 1892, under which Thoreson paid his money, was held void and of no effect, no one did or could acquire any rights; and hence the State of Utah, in its legal capacity as a state, did not and could not obtain any of Thoreson's money, and hence ought not be required to pay back any. It was the foregoing contention that the court combated in the Thoreson Case, but in doing so the constitutional question in some way became involved, and in this way both the argument and what was really decided in that case are, to say the least, involved in considerable confusion, if not in doubt. But while this may be so, the real questions involved in the Thoreson Case, and the ones this court was called on to determine, were singularly free from doubt. One of these questions, briefly stated, was whether the legislature of a state has the power to direct that money received by state or county officers, under a void law, should be repaid to the person who paid the same. In connection with this the further question arose whether the state officers, who were required to execute the later law, could in any way inquire into the effect of the former law, which had been held invalid in a proper proceeding by a court of competent jurisdiction. It should require no argument to show that the officers, who were, by the legislative power, directed to do certain things which were deemed necessary by reason of the invalidity of a prior law, could not interpose any objections to what the legislature may have deemed just and proper, nor could such officers inquire into the effects resulting from the invalidity of the prior law. These questions were wholly immaterial, since the later law was passed upon the accepted fact that the prior law was invalid, and, further, that it had been so declared by a court of competent jurisdiction, and hence no such officer could, either directly or indirectly, question or review the act of the legislature

which directed that any money, which was paid under the invalid law, should be returned to the person paying the same. This is all that really was involved in the Thoreson Case, but because the Attorney-General mooted the question of what construction should be placed upon section 963, *supra,* constituting the later act, and contended that if the construction which he placed upon it were not accepted, then the whole section would be invalid upon constitutional grounds, the court was induced to follow him into a matter which was not really involved, and was not necessary to decide, in order to arrive at a correct solution of the real questions in the Thoreson Case.

The decision that the officers of this state had no power to question the legislative discretion in providing against a miscarriage of justice and right by reason of the invalidity of a prior law, and the effect of holding that law invalid, were not matters of their concern, and could not be raised by them in the manner it was attempted in the Thoreson Case, was clearly right. The authorities cited by the court in support of the doctrine that a ministerial officer in a mandamus proceeding, to compel him to comply with the provisions of an act, may not, in that proceeding, attack the validity of the act, in our judgment do not support the doctrine. The case of *People v. Salomon,* 54 Ill. 39, from which the court quotes rather copiously in the Thoreson Case, was a case where a clerk refused to enter of record the proceedings of a board of equalization in raising the assessed valuation of property. His refusal was based upon the ground that the law which authorized the action of the board which the clerk refused to record was unconstitutional. Mandamus proceedings were then instituted against the clerk to compel him to enter of record the aforesaid proceedings. He defended upon the ground that the law authorizing the board of equalization to raise the valuation of the property was unconstitutional, and therefore void. The court in the mandamus proceedings permitted him to make this defense, but held the law valid, and ordered him to enter the proceedings of the board upon the books, and,

upon his failure to comply with the court's order, contempt proceedings were commenced against him, and the language quoted by this court is found in the opinion of the court in the proceedings for contempt. It is apparent, there- fore, from the very case cited as an authority against the proposition, that a ministerial officer was, in a mandamus proceeding, permitted to make the defense that the law under which he was required to make the entry was unconsti- tutional, and this, too, where it was made to appear that the clerk was a mere subordinate officer, and simply carried into effect the order of his superiors; that is, simply made the record required by law of their proceedings. After the law had been declared valid, however, he was not also permitted to make the defense that he failed to act because the books in which he was required to enter the proceedings and resolu- tions of the board of equalization, pending the mandamus proceedings, had been delivered by him to other officers and hence he could not comply with the order of the court. It is in answer to this defense that. Mr. Chief Justice Breese uses some strong language with respect to the duty of min- isterial officers to comply with the law. The case is, how- ever, not an authority upon the point that a ministerial officer, who is responsible for his official acts, may not in a mandamus proceeding attack the constitutionality of the law under which he is required to do some act which he thinks is forbidden by the higher or organic law. No such. question was presented or decided in the case of *Tremont School District v. Clark,* 33 Me. 482. While in the case of *Waldron v. Lee,* 5 Pick. (Mass.) 323, it is said that a ministerial officer should not stop to question the law, yet the court clearly holds that in a proceeding to compel him to act, if it is clearly made to appear from his return that the law under which he should act is invalid, the court will not compel him to act. This is far from holding that a ministerial officer may not attack a law in a mandamus proceeding. All that is decided in *Davis v. Superior Court,* 63 Cal. 582, is that the Supreme Court, as constituted in 1883, would follow the ruling of the Supreme Court of

California as constituted under the Constitution of 1849 "with reference to the mode in which the invalidity of a legislative act, or its repugnancy to a clause of the then existing Constitution could be presented or insisted upon." Since it had been held by that court that under the Constitution of 1849 that court had no power to pass upon the constitutionality of a law in a particular proceeding, the court, in the case cited, followed the former decision, but in no way intimated how it would hold upon the question under the new Constitution. In *State v. Douglas County,* 18 Neb. 506, 26 N. W. 315, the question was not presented. When the question was presented, however, to the Supreme Court of Nebraska in a later case, that court held the contrary doctrine, as appears from the case of *Van Horn v. State,* 46 Neb. 62, 64 N. W. 365. In *Maxwell v. Burton,* 2 Utah 595, it was held that, where an act had been performed by an officer in accordance with a particular law, mandamus was not the proper proceeding to compel such officer to undo what he had done; and it was further held that under such circumstances the court would not, in a mandamus proceeding, determine the validity of the law under which the officer had acted. The question now under discussion was not referred to. In *People v. Stephens,* 2 Abb. Prac. N. S. (N. Y.) 348, it is held "that it is rarely, if ever, proper to award mandamus in a case in which it can only be done by declaring an act of the legislature unconstitutional. That should be done in a more solemn mode of adjudication, upon a full trial, and not on an ordinary motion." In addition to the foregoing, three other cases are cited in the Thoreson Case, namely: *Smyth v. Titcomb,* 31 Me. 272; *Wright v. Kelley,* 4 Idaho 624, 43 Pac. 565; and *State v. Buchanan,* 24 W. Va. 365, 384. While it is true that the general statement that courts will not determine the constitutionality of an act in mandamus proceedings is made in all three cases, and in at least one of them (*State v. Buchanan*) it is said that in such a proceeding a ministerial officer will not be permitted to justify that the

law under which he is required to perform a certain minis-
terial·act is unconstitutional, yet, upon a close examination
of the cases, it will be discovered that the precise question
now presented was not involved in any one of them.

The real question involved in a majority of the cases
cited in the Thoreson Case was whether a subordinate officer
could invoke the unconstitutionality of a law in a matter
where the act was one in which the subordinate officer
merely executed the orders of his superior, and when the
superior, and not the subordinate, was in fact responsible
for the official act. For the purposes of this decision, we
shall assume that when the duty to act devolves upon a
superior officer, who directs one of his subordinates to per-
form the act, such subordinate may not, in effect, review
the decision and order of his superior and refuse to act
upon the sole ground that the law is unconstitutional. Under
such circumstances, the superior, and not the subordinate,
is responsible for the official act in question.

We think a careful perusal of the authorities will dis-
close that while some of the cases contain general expressions
which would seem to indicate that an officer in a mandamus
proceeding against himself, requiring him to do a minis-
terial act, may not justify his failure to act upon the sole
ground that the law directing the act is unconstitutional, the
direct question now before us was not really involved in
those cases. Where the question whether an officer acting
ministerially, who is directly responsible for his of-
ficial acts, may attack a law in a mandamus pro-
ceeding, was actually before the courts, the great
weight of authority is to the effect that such an officer may,
in such a proceeding, justify his refusal to act upon the
ground that the law requiring the act is unconstitutional.
The following well-considered cases leave little, if any, room
for, doubt or controversy upon this question. (*Van Horn
v. State, supra; Norman v. Kentucky Board of Exam-
iners, etc.,* 93 Ky. 537, 20 S. W. 901, 18 L. R. A.
556; *McDermont v. Dinnie,* 6 N. Dak. 278, 69 N. W.

294; *Denman v. Broderick,* 111 Cal. 97, 43 Pac. 516; *Brandenstein v. Hoke,* 101 Cal. 131, 35 Pac. 562.)

When the law requires an officer to act, although the act be ministerial merely, if he is directly responsible for his official acts he may refuse to act, if in his judgment the law is in conflict with some constitutional provision, and, in case proceedings are instituted to coerce him, he may set up the supposed defect in the law as a defense. No other conclusion is permissible if the Constitution is the supreme law, and if legislative acts in conflict therewith are not merely voidable but are absolutely void. A legislative act which is in conflict with the Constitution is stillborn and of no force or effect— impotent alike to confer rights or to afford protection. This general doctrine is adopted by the courts generally and is the doctrine promulgated by the Supreme Court of the United States, as appears from the case of *Norton v. Shelby County,* 118 U. S. 442, 6 Sup. Ct. 1125 (30 L. Ed. 178), where Mr. Justice Field, in speaking for the court, says: "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

If this be true, how can any officer, who is responsible for his official acts and who has taken the required oath of office that he "will support, obey, and defend" the Constitution of the state, justify any act which in his judgment is contrary to or is forbidden by the Constitution, and which is in fact so, although the act be required of him by some legislative enactment? The fact that the act required at his hands is merely ministerial does not change the effect so far as the officer is concerned. If the legislative enactment under which he is required to act is in conflict with the Constitution, the Constitution and not the enactment prevails, and the officer must obey the Constitution or violate his oath of office. If, however, a court of competent jurisdiction has entered judgment declaring the enactment valid, and such judgment under the general law is binding

upon the officer, then the officer may not disregard the judgment and refuse to act simply because in his judgment the court has erred. Under such circumstances he is relieved from further responsibility the same as a mere subordinate who is not responsible for the official act would be, and hence cannot legally refuse to act. But if no court has passed upon the question, and the act is **4** not one required of a subordinate merely, as outlined above, then we cannot see upon what theory a court can refuse to pass upon the constitutionality of the law in any proceeding where the question is properly presented and to which the officer is a party. Mere personal interest of the officer cannot be the sole test. That the doctrine that a party who attacks the constitutionality of a law should have some interest in having the question determined is based upon good reason and should be enforced is conceded; but has the officer, who is responsible for his official acts, no interest in complying with his oath of office and in obeying the Constitution? Moreover, if an unconstitutional act is absolutely void and affords no protection to any one, has an officer no interest in avoiding an illegal act which, under peculiar circumstances, may subject him to the payment of substantial damages to some injured party in case of the enforcement of a void law? Can a court absolve the officer from these consequences by the mere declaration that the proceedings in which the validity of the law is questioned is, in the judgment of the court, not the proper one because others who are not parties to the proceedings may have some interest in the question? It seems to us that such a position is illogical, if not unreasonable. It may well be that others may have a direct interest in the question whether the law in question is valid or invalid, but though this be so, and the court thinks such parties should be heard, it may afford them an opportunity to be heard by at least requesting them to appear and thus defer the enforcement of the law until it is determined that it is constitutionally enforceable. Again, in acts which affect the public at large, not every individual who may be affected can be made a party to the

proceedings. In such cases some official or board must ordinarily represent the public interests. In this case we think the defendant board directly represents the taxpayers. In our judgment, therefore, it was their duty to refuse to act if in their judgment the law which directed the act is void. If such is not their duty, then they owe no duty to the people whose servants they are.

But, considering the question entirely apart from these latter considerations, we think the rule contended for by plaintiff, and which, it is claimed, is sustained in the Thoreson Case, is not sustainable upon either reason or sound principles. Moreover, in our judgment, the great weight of authority is likewise against such a rule. The question whether the officer who is required to act is a ministerial officer, and the duty imposed is merely ministerial, when such officer is nevertheless responsible for his official acts, is not material in determining whether a law may be attacked upon constitutional grounds in a mandamus proceeding. In our judgment, any officer who is not merely discharging the duties of a subordinate, and for whose official acts some superior is not responsible, of necessity must be held responsible for his own official acts, both to the people at large and to any or all individuals who may be injuriously affected thereby, in case such acts are contrary to the Constitution and void. If this be not so, then those officers owe no duty to the people unless and until some court feels disposed to pass upon the question in a proceeding which the court deems a proper one. As the decisions of this court now stand, it is not clear whether such questions may or may not be reviewed in a mandamus proceeding. While in the Thoreson Case the right was denied, yet in a later case, *State v. Standford,* the question was entertained and passed upon. In order, therefore, that there may be no misconception with regard to what the rule is in this jurisdiction, we feel constrained to hold that anything which may be contained in the Thoreson Case, or any other case, which is contrary to the rule laid down in this opinion, is hereby modified and overruled.

In determining the questions raised by defendant it will be necessary to refer to some of the provisions of the enabling act in which certain lands were granted by the government of the United States to the State of Utah for certain purposes, and to construe such provisions in connection with certain sections of the Constitution of this state. Section 8 of the enabling act (Act Cong. July 16, 1894, c. 138, 28 Stat. 109), after granting certain lands to the State of Utah "for the establishment of the University of Utah," contains the following language: "That the proceeds of the sale of said lands, or any portion thereof, shall constitute permanent funds to be safely invested and held by said state, and the income thereof to be used exclusively for the purposes of such university." By section 10 of the same act it is also provided: "That the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools." In view of the express provisions in section 8, *supra,* relating to the University of Utah, we assume that the general provisions contained in section 10 just referred to were not intended to apply to the proceeds derived from the sale of lands granted for university purposes, and we shall proceed upon such an assumption. In section 2 of article 10 of the Constitution, the University of Utah is made a part of what is designated "the public school system" of this state. Section 5 of the same article reads as follows: "The proceeds of the sale of lands reserved by an act of Congress approved February 21, 1855, for the establishment of the University of Utah, and of all the lands granted by an act of Congress approved July 16, 1894, shall constitute permanent funds, to be safely invested and held by the state; and the income thereof shall be used exclusively for the support and maintenance of the different institutions and colleges respectively, in accordance with the requirements and conditions of said acts of Congress." Section 7 of the same article is as follows: "All public school funds shall be guaranteed by the

state against loss or diversion." Section 1, article 20, reads as follows: "All lands of the state that have been, or may hereafter be, granted to the state by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted and declared to be the public lands of the state; and shall be held in trust for the people to be disposed of as provided by law for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired."

It is insisted by the defendant that in view of the foregoing provisions the lands specified in the enabling act were granted to the state in trust for the purposes mentioned in said act, and that the people of the State of Utah, in adopting the Constitution, declared that the proceeds derived from the sale of all lands granted to the state for the benefit of the university were trust funds, which must be safely invested and held by the state; that only the interest or income derived from such proceeds can legally be turned over to the officers of the university for its use and benefit; that by the act of 1909, which we have quoted in full, at least a portion of the proceeds derived from the sale of lands granted in trust for university purposes is directed to be turned over to the university for its use and benefit, and that said act in directing this to be done is in conflict with the constitutional provisions above quoted, and is therefore void. In other words, it is contended that by the act of 1909 the trust fund is being diverted, and that this may not be done because it is prohibited by the Constitution. In answer to this contention counsel for plaintiff in effect says that the University of Utah is a corporation existing as such under the laws of this state; that it is legally competent to enter into contracts and to incur debts; that under the act of 1909 no more is attempted or done than to authorize a loan of the amount of money mentioned in said act to the University of Utah out of the permanent land fund created for its use and benefit, which loan is to be repaid by said university to said fund as provided in said act. It is there-

fore insisted that the act of 1909 merely directs the defend-
ant to invest a portion of the proceeds derived from the sale
of said trust lands in the form of a loan to the University
of Utah.    This, it is contended, constitutes a mere invest-
ment, and whether such a loan would be a safe investment
or otherwise was a matter entirely within the discretion and
judgment of the legislature, and is not subject to
review either by the defendant or by this court.      **6**
Plaintiff's counsel also invokes the doctrine fre-
quently announced by this and other courts that in order
to declare a legislative act void upon the ground that it is
in conflict with the Constitution, such conflict must be very
clear, or, as it is sometimes expressed, if the court enter-
tains a reasonable doubt upon the question, then the law
must be upheld.    (*Edler v. Edwards*, 34 Utah 13, 95 Pac.
367, and cases there cited.)    Counsel on both sides have
argued the foregoing questions fully and with much force
and ability.    In view, however, that it is strenuously in-
sisted by the Attorney-General that the act of 1909 is in
conflict with another constitutional provision, and as in our
judgment it is clear that such is the case, for the reason that
the loan authorized and contemplated by said act is not a
loan to the university except in name, and is not an obli-
gation or debt of said university, but is both in law and fact
the obligation and debt of the State of Utah, we have there-
fore concluded to refrain from passing upon the very in-
teresting questions referred to above.

The constitutional provisions referred to are contained in
sections 1 and 2 of article 14 of our Constitution, which
read as follows:

"Section 1.   To meet casual deficits or failures in revenue, and
for necessary expenditures for public purposes, including the erec-
tion of public buildings, and for the payment of all territorial
indebtedness assumed by the state, the state may contract debts,
not exceeding in the aggregate at any one time, the sum of two
hundred thousand dollars over and above the amount of the ter-
ritorial indebtedness assumed by the state.   But when the said ter-
ritorial indebtedness shall have been paid, the state shall never
contract any indebtedness, except as in the next section provided,

in excess of the sum of two hundred thousand dollars, and all
moneys arising from loans herein authorized, shall be applied solely
to the purposes for which they were obtained."

"Sec. 2.   The state may contract debts to repel invasion, sup-
press insurrection, or to defend the state in war, but the money
arising from the contracting of such debts shall be applied solely
to the purpose for which it was obtained."

The phrase "shall never contract any indebtedness," in
our judgment includes any obligation which the state under-
takes or is obligated to pay or discharge out of future ap-
propriations; that is, appropriations not made by the legis-
lature creating the debt or obligation, and to be paid from
moneys derived from levies other than those made by the
then existing legislature, and which must necessarily be
raised by levying a tax upon the property of the entire state,
as contradistinguished from a mere city, county, or district
levy.   In other words, in order to constitute an indebted-
ness within the provisions of the constitutional limitation it
is not necessary that the debt be evidenced by bonds, notes,
or other usual evidences of indebtedness, but it is sufficient
if in order to discharge the debt the state is obligated to pay
it at some future time, and that it casts a future burden
upon the taxpayer to the extent of a debt or obligation which
must be paid by the state of Utah with funds derived from
general taxation.   In the following cases the general ques-
tion of what constitutes an indebtedness within a consti-
tutional limitation clause similar to ours is fully discussed
and applied.   A careful perusal of these cases will, we
think, convince any one that the method adopted by the
act of 1909 makes the debt or obligation authorized by the
act a debt of the State of Utah pure and simple.   Among
other cases which might be cited we specially refer to the
following:   *People v. Johnson,* 6 Cal. 503; *Nougues v.
Douglass,* 7 Cal. 77; *Coulson v. Portland,* 6 Fed. Cas. 629
(Case No. 3275); *Sloan, Stevens & Morris v. State,* 51 Wis.
632, 3 N. W. 393; *Board, etc., v. McMillan,* 12 N. Dak.
300 *et seq.,* 96 N. W. 316 *et seq.*; *McNeal v. City of Waco,*
89 Tex. 83, 33 S. W. 324; *State v. City of Helena,* 24 Mont.

521, 63 Pac. 99, 55 L. R. A. 336, 81 Am. St. Rep. 453; *Council Bluffs v. Stewart,* 51 Iowa 385, 1 N. W. 628; *French v. Burlington,* 42 Iowa 614; *City of Springfield v. Edwards,* 84 Ill. 632; *Law v. People,* 87 Ill. 385; *Prince v. City of Quincy,* 128 Ill. 443, 21 N. E. 768; *Buchanan v. Litchfield,* 102 U. S. 278, 26 L. Ed. 138; *Litchfield v. Ballou,* 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132.

In the last two cases the decisions in the cases cited from Illinois are reviewed and sustained. In the case of *Coulson v. Portland, supra,* it was attempted to make the debt there in question the debt of a railroad company by declaring it to be so in terms when it in fact was intended and provided in the act that the city of Portland should pay it, if it was paid at all, just as the state of Utah must in fact pay the loan authorized by the act of 1909, if it is ever to be paid. That such is the real purpose and intent of the act of 1909 seems to us can leave no room for doubt in the minds of reasonable men. When the act of 1909 is fully analyzed, and is stripped of all technicalities, it amounts to this: The University of Utah, as a state institution, is given the use of the fund mentioned in the act, while the state assumes the debt and is obligated to pay it. While it is true that the university is a corporation and thus constitutes a legal entity with a limited capacity, yet, when all of the provisions of law, which in some way relate to and affect the government of the university are considered and construed together, it is made very clear that the corporation designated the University of Utah was created and exists for the sole purpose of more conveniently governing and conducting the educational institution called the "University." The university is clearly a state institution, and is so treated, since the members constituting its governing board are all appointed by the governor with the consent of the senate, and the board regularly reports to the governor. Moreover, the corporation holds all the property in trust merely. In fact the property belongs to the State of Utah. We think no one will seriously contend that the corporation styled the "University of Utah" has the power or authority, without the

consent of the State of Utah, to dispose of any property. While the naked legal title to the buildings and paraphernalia may be vested in the corporation, it is, nevertheless, held in trust for the State of Utah, which is obliged to hold and use and maintain it for school purposes. The real ownership is thus in the state, and if the university property is destroyed from any cause it is the loss of the state, and the burden of restoring it must, as it should, fall upon the state at large. The state also must provide the necessary funds to conduct and maintain the university by the same means and in the same manner that all other state institutions are maintained. The state trust funds now are, and perhaps always will be, entirely insufficient for this purpose. According to the last biennial report of the board of regents of the University of Utah to the governor, and of which we are authorized to take judicial notice, the estimated income from the proceeds of all land sales now amounts to $22,000 annually, or to $44,000 for the years 1909 and 1910. The estimated income from all other sources, not including appropriations from the state for the years aforesaid, amounts to $28,000 more. The total estimated income from all sources, not including appropriations from state moneys raised by taxation, for the next two years is, therefore, $72,000, while the expenses of conducting and maintaining the university alone, not including the other schools and institutions connected with it, for the next two years, were estimated at $318,000. By reference to the general appropriation act of 1909 it will be seen that the following provision was made for the University of Utah, namely:

"For general maintenance of the University of Utah, including the State Normal School, the State School of Mines, the School of Arts and Sciences, including salaries, fuel, printing, advertising, stationery, insurance, general improvements and repairs, gas, electric light and power, apparatus, books and supplies, taking care of grounds and necessary and miscellaneous expenses, etc., but does not include new buildings and their equipment, the purchase of water rights or land for the two academic years from July 1, 1909, to June 30, 1911, or so much thereof as may be necessary, $300,000."

While this is considerably less than the amount demanded for those purposes, it, nevertheless, is $228,000 in excess of the income derived from the trust funds and all other sources. As a matter of information merely, we remark that the different schools mentioned in the foregoing quotations are all conducted and carried on in connection with the university. Every dollar in excess of the $72,000 derived from other sources must, therefore, be raised by a tax levied upon all the taxable property within the state, and must be paid out of the state treasury. We mention this simply because it is clear that it would not change the result, even though a portion of the $72,000 were appropriated and set aside for the payment of the principal and interest of the obligation in question. If the amount necessary to pay principal and interest were in fact taken from the income of the university, it would simply result in requiring the state to supply the amount so taken from its general fund for "general maintenance," and hence nothing would be gained, so far as the taxpayer is concerned, by making the obligation payable out of the income before referred to. It is for this reason, no doubt, that the legislature directed the board of regents to pay both principal and interest out of the general appropriations as they will be made from time to time. There is not the slightest attempt in the act to conceal the fact that the debt authorized by it must be paid, both principal and interest, from appropriations made from the funds of the state, which are obtained by general taxation. The legal effect of the act of 1909, so far it affects the relations of the university and the state, may be said to be that while the obligation authorized by the act is in terms made the debt of the university, yet, in the same act, the university is entirely absolved from the duty and burden of paying it, while the state is made to assume this duty, and is thus made the real debtor. If this be so, it becomes entirely immaterial whether the board of regents executed the notes provided for in the name of the university or not. The state must, nevertheless, pay both the principal and interest of those notes,

if they are paid at all. These notes, therefore, both in law and fact, are state obligations. But it is nevertheless contended that the notes are in fact the notes of the university and thus do not constitute a state indebtedness, and hence do not fall within the constitutional debt limit any more than debts of counties, cities, school districts, and other like agencies of the state come within this limit. We cheerfully concede that county, city, and school district debts are not state obligations, and do not come within the constitutional inhibition. From the facts and circumstances disclosed, however, it seems clear that the debt in question is not analogous to an ordinary county, city, or school district debt.

But apart from all that has been said, we think it is a state obligation for other reasons. The legislative act itself placed the duty upon the state to pay it out of state funds, all of which are to be obtained from future tax levies. Again, in section 2 of the act it is provided that the interest upon the very fund, which it is claimed is loaned to the university, shall continue to be paid to the university. It is thus in effect provided that the interest upon the loan shall be paid to the alleged borrower. Who is it that must pay this interest? It can be no one but the State of Utah. The State of Utah is therefore obliged to pay the accruing interest upon a debt declared to be the debt of the university. Moreover, if we consider the nature of the funds that are authorized to be loaned by the act and the relation of the state to those funds, by reason of the express constitutional provision referred to, then there remains no doubt as to whose obligation it is. The funds authorized to be turned over to the university are all trust funds which the state is obliged to protect against loss or diversion. The state, by an express pledge in the Constitution, therefore, must maintain the fund intact. If the state, therefore, authorizes any one to use $250,000 of this fund, the state, impliedly at least, guarantees the repayment thereof. The state is thus always obligated as a guarantor of the fund. If this were all, however, and it were clear that the obligation to pay the debt rested upon some other agency than the state, we

would not be inclined to hold that it is the state's obligation although the state stands in the relation of guarantor. When the whole act is considered, however, it is very clear that it was declared to be the debt of the university for no other purpose than to avoid coming in conflict with the debt limit contained in the Constitution. This purpose is so manifest from the act itself that it hardly needs to be pointed out. As is well said by the Supreme Court of California in referring to a similar constitutional provision in the case of *Pattison v. Board, etc.,* 13 Cal. 183: "The intent of this clause of the Constitution is plain enough; it was designed as a check on legislation, and on such legislation as might create a charge upon the property of the entire state." Is it not palpable that the obligation in question creates a charge upon the entire property of the state in the form of interest alone amounting to more than $130,000, and as principal and interest aggregating a sum in excess of $380,000, all of which must be paid within the time limit fixed in the act, and must be paid with moneys obtained from general taxation and appropriated out of the general funds of the state? If this does not constitute a state indebtedness we cannot conceive how one can be created unless it would be by issuing state bonds. If an attempt had been made to issue state bonds to the amount of $250,000, no one would question their unconstitutionality because in excess of the constitutional debt limit, yet the necessary money for the payment of such bonds, both principal and interest, would have to be and would be obtained precisely in the same manner as the money must, and is, in fact, directed to be obtained for the payment of the obligation in question. Notwithstanding this, it is contended that the indebtedness authorized by the act in question is not a state indebtedness. We are unable to yield assent to such a contention.

If the debt limit may be exceeded in the manner provided for in the act of 1909, then there is practically no limitation in this state. The next legislature may authorize the officers of the Agriculture College to incur $250,000 indebtedness to be paid by the taxpayers in the same way. More-

over, the legislature may authorize and direct the persons who, for the time being, are directing the affairs of other state institutions to incur obligations, if in doing so they make them payable by a particular institution. If this may be done to assist one state institution, why may not all be assisted in the same way? Why cannot this constitutional limitation be avoided by a law authorizing the creation of a corporation with authority to provide ways and means by making loans for the erection of all state buildings nominally to be paid for by such corporation, but in fact to be paid by the state out of the funds obtained from general taxation and by future appropriations? If the act in question is not in conflict with section 1 of article 14 of our Constitution, then we cannot perceive why a debt incurred as indicated above would be. To our minds the conclusion that the obligation authorized by the act of 1909 is a state obligation and comes within both the letter and spirit of section 1 of article 14 of the Constitution admits of no doubt. This being so it is clearly our duty to declare the act void because in conflict with a constitutional provision.

The question as to whether the act is only void in part is not doubtful. It is quite clear that the legislative aim was to avoid any state indebtedness for the purposes stated in the act. From this we must assume that, if the act in terms had declared any part of the whole amount named in the act as constituting a state indebtedness, the whole act would have been defeated. The condition, therefore, is not one where the constitutional part can be separated from the unconstitutional, and the constitutional part upheld and the unconstitutional part declared void. In this instance the whole act must fail.

Much as we regret, even deplore, the necessity of even temporarily depriving the university of the use of a much needed building, we nevertheless must yield obedience to the Constitution rather than follow our own desires or inclinations in avoiding inconveniences in conducting public institutions. The constitutional provision in question is clear, and, like all other provisions, should be obeyed, and not ignored

or frittered away by forced construction. If the people think it wise or prudent to authorize a larger debt limit they may easily amend the Constitution, but, if amended, it should be done by those who are responsible for its original design and purpose.

In conclusion we remark that the facts and circumstances which control in the cases cited by counsel, and which have not been referred to in this opinion, are, in our judgment, clearly distinguishable from the facts and circumstances in this case, and hence we have refrained from mentioning them. From what has been said it follows that the writ prayed for should be denied; and it being clear that the application cannot be amended so as to avoid the constitutional clause, the application should be dismissed. It is so ordered.

McCARTY, J., concurs.

STRAUP, C. J. (Concurring).

When the alleged prescribed legal duties of an officer rest upon the provisions of an unconstitutional enactment, I think he, when commanded to perform such duties, or show cause for not doing so, may justify his refusal or failure to perform on the ground of the invalidity of the statute. If a contrary rule was declared in the Thoreson Case (as I think was intended to be declared), it was overruled in the Standford Case. Since then, the latter, and not the former, case expresses the law on such question in this jurisdiction.

The act in question authorized the regents of the university to expend $250,000 for the erection of a building for the university. The Constitution forbids the incurring of state debts, exceeding in the aggregate at any one time the sum of $200,000, to meet casual deficits, failures in revenue, or necessary expenditures for public purposes, including the erection of public buildings. The moneys and funds appropriated by the legislature for the university were not available, for such funds were all appropriated and needed for general maintenance of the university. The legislature

saw that a state debt could not legally be incurred for the desired purpose in the sum of $250,000. The Constitution further provides, as does also the enabling act, that the proceeds of the sale of lands granted to the state by the United States for the benefit of the university "shall constitute permanent funds to be safely invested and held by said state, and the income thereof to be used exclusively for the purposes of said university." The proceeds derived from the sale of such lands have from time to time been invested by the state land board and the income thereof paid to the university. Such yearly income amounts to something like $22,-000. Now, the problem attempted to be solved by the legislature is this: How can it make available the permanent land fund so invested by the land board and give the university $250,000 thereof, and have the state pay it back, without violating the constitutional provisions referred to? I say the state, because, as is well shown by Mr. Justice Frick, the university has no property or funds nor any source of income with which to meet and pay the money, except from the funds appropriated to it by the state. The act in question is the attempted solution. It directs the regents of the university to expend $250,000 to erect a building, and the land board to convert into cash sufficient of the investment of the permanent land fund as shall, together with the cash on hand, amount to the sum of $250,000, and to pay the same at once to the regents. It further provides that the university, by the regents, shall execute promissory notes by the terms of which the university promises and agrees to pay the $250,000 so received by it from the land board, the first $12,500 of which and the interest thereon to be paid in 1912, and the further sum of $12,500 and the interest thereon each year thereafter until the amount of $250,000 and the interest thereon is paid. In order that the university may have funds with which to meet and make such payments, it is further provided that "the board of regents of the University of Utah are authorized and empowered to pay, out of the funds appropriated, or otherwise available for its general maintenance, the principal and in-

terest of the said obligations as they become due." The legislature saw that if the act required or directed the regents to pay "said obligations" out of the funds appropriated for such purpose, the transaction would be recognized as and would be an obligation or debt of the state. So, to avoid such effect, and not offend against the Constitution in that regard, the legislature provided that the regents should pay "said obligations" out of funds appropriated for "general maintenance" of the university. Thus the idea is conceived that if funds are appropriated by the legislature for "general maintenance," and it directs the regents to apply them in payment of "said obligations," a purpose for which the appropriations are not apparently to be made, it has well behaved and not offended against the Constitution, and has made itself believe that by making appropriations under the name of "general maintenance," and by permitting and directing such funds to be taken and applied in payment of "said obligations," no appropriations have been made to pay the obligations. So long as the legislature permits and directs the funds so appropriated to be applied in payment of the obligations, what does it matter in what name the appropriations are made? Furthermore, a very troublesome question arises in case appropriations of funds are made for a certain and specific purpose—"general maintenance" of the university—as to whether the regents could lawfully divert and apply them to another purpose, notwithstanding the power and authority attempted by this act to be conferred upon them. The two acts of the legislature, one making an appropriation for a certain and specific purpose and the other directing the funds so appropriated to be applied to another and different purpose, would seem not to be very harmonious. I cannot see wherein the legislature would more have offended against the Constitution had it provided in the act that the obligation should be paid from future funds to be directly and specifically appropriated for such purpose. But in order that the obligation may not be called a debt of the state, the legislature declared that "it shall

36 Utah—28

be a debt of the university and not of the state." It would seem that the legislature, by the course pursued by it, was apprehensive of the charge that it had offended against the Constitution, and desired to put such question at rest by declaring that it had not done so. And the way to do that was to declare that the obligation, no matter what in fact it may be, was a debt of the university and not of the state. So, too, since the Constitution permits only the income of the permanent land fund to be paid to the university, and since such yearly income was only $22,000, and since the legislature had provided that sufficient of the investment of such land fund should be converted into cash as would, together with the cash on hand, amount to $250,000, and directed the same to be paid at once to the regents of the university, it might also seem that there would be, in such case, something more paid to the university than the mere income, and the charge made that the Constitution was again violated, it further declared that the paying of such moneys by the land board to the university shall be and is called a "loan" and "an investment." I apprehend that a trustee, who was charged with a trust fund and who was required to safely invest it and only pay the income thereof to the beneficiary, but who, when the had paid the whole fund to the beneficiary, was called to answer a charge of a breach of his trust, might as well assert that the fund was only "loaned" to the beneficiary and "invested" with him, and by such a defense could defeat the very purpose of the trust. If the acts required to be done by the legislature are harmful and incompatible with the Constitution, such effect cannot be avoided by the legislature calling them innocent, or by giving them a particular name. Neither can it be avoided by the requirement in the act that "all laws in conflict herewith shall be so construed as to carry out the provisions of this act." The direction that the laws shall be so construed, whether they bear such a construction or not, encroaches upon the prerogative of the courts. The legislature must content itself with the power of making laws. It cannot also direct the construction that shall be given them. If we

were permitted to follow the direction and make the Constitution and all other laws yield to the act, we, undoubtedly, would be relieved from many difficulties and much responsibility. The Constitution, however, wisely forbids the adoption of such a principle of construction. The legislature's attempt to give the university a much needed building is of course commendable. But I think the manner in which the attempt is made is clearly incompatible with the Constitution. I, therefore, concur in the judgment denying the writ.