295 P.2d 348

**UNIVERSITY OF UTAH, a body politic and corporate, Plaintiff and Respondent,**

v.

**BOARD OF EXAMINERS OF STATE OF UTAH and J. Bracken Lee, Heber Bennion, Jr., and Clinton D. Vernon, Members of said Board; Commission of Finance of the State of Utah and P. H. Mulcahy, Truman C. Curtis and Milton B. Taylor, Members of said Commission; Clinton D. Vernon, as Attorney General of the State of Utah; Reese M. Reese, as Auditor of the State of Utah and Ferrell H. Adams, as Treasurer of the State of Utah, Defendants and Appellants.**

No. 8253.

Supreme Court of Utah.

March 22, 1956.

Lynn S. Richards, Daniel S. Bushnell, Salt Lake City, for appellants.

E. R. Callister, Jr., Atty. Gen., and H. R. Waldo, Jr., Asst. Atty. Gen., Salt Lake City, for appellants.

WORTHEN, Justice.

This is an appeal from a declaratory judgment holding that Article X, Section 4 of the Utah Constitution establishes the University as a constitutional corporation free from the control of the Legislature, administrative bodies, commissions and agencies and officers of the State.

410

The action was instituted by the University of Utah, acting through its Board of Regents, against the named defendants alleging that said defendants, pursuant to claimed legislative and constitutional mandate, asserted the legal right to exercise control over and management of the University in derogation of the claimed rights of the University and its Board of Regents granted by Article X, Section 4 of the Constitution of Utah.

The defendants admit that they claim the right, and allege that it is their duty under legislative enactments authorized by the Constitution of Utah and by constitutional mandate, to exercise control over, and management of, the University. The defendants further deny that the University was, by Article X, Section 4 of the Constitution of Utah, granted a status which frees it from the control of the legislative bodies, commissions, agencies and officers of the State. Defendants assert that the University is subject to and bound by the laws of Utah from time to time enacted and to the jurisdiction and authority of defendants exercised pursuant to the laws of Utah conferring such control and management of said University. The questions raised as to control and supervision of certain funds and as to the claimed curtailment of powers of the University will be resolved by our construction of Article X, Section 4 of the Constitution of Utah which provides:

"The location and establishment. by existing laws of the University of Utah, and the Agricultural College are hereby confirmed, and all the rights, immunities, franchises and endowments heretofore granted or conferred, are hereby perpetuated unto said University and Agricultural College respectively."

The University of Utah prayed that a declaratory judgment be made and entered defining the rights, immunities, franchises and endowments which are granted, conferred and perpetuated unto it by Section 4, Article X of the Constitution of Utah; that a decree be made and entered declaring that the Legislature of the State of Utah has no power to authorize any or all of said defendants to interfere with or to assume, exercise or administer any of the rights, immunities, franchises or endowments granted and conferred unto the plaintiff in the management and control of the University, and that the defendants be restrained forever from assuming, exercising and administering any powers and acts which interfere with the management and control of the property and affairs of the University of Utah by its Board of Regents.

The defendants admitted the substantial allegations of plaintiff's complaint as to the legislative enactments complained of, but asserted the legality of the enactments, denied that plaintiff is a constitutional corporation, and alleged that plaintiff is a public corporation and subject to the laws of Utah from time to time enacted. The defendants pray that a declaratory judgment be en-

tered declaring that the University is a state institution subject to and bound by the laws of Utah from time to time enacted.

The issues were submitted to the court upon stipulations of fact, and the trial court decreed that the University is a constitutionally confirmed body corporate, perpetually vested with all the rights, immunities, franchises and endowments of the territorial institution, beyond the power of the Legislature, all administrative bodies, commissions, agencies, and officers of the State of Utah to infringe upon, curtail, abrogate, interfere with or obstruct the enjoyment of the same, or otherwise, or at all, assume, or exercise any jurisdiction over the affairs of the University of Utah, and the powers of its Board of Regents, except for the general control and supervision conceded by the University to the State Board of Education.

The trial court declared unconstitutional certain statutes which treated the University as other state institutions, requiring preaudit of bills, submission of work programs and deposit of funds into the State Treasury, including University funds from appropriations and dedicated credits.

What is the effect of the quoted section on the power of the Legislature to act respecting the University?

We must determine what rights, immunities, franchises and endowments are perpetuated unto the University by Article X, Section 4 of the Constitution. In order to answer this question, resort must be made to territorial laws fixing the rights and status of the University at the time the Constitution was adopted.

That the issues and questions presented may be understood, it is deemed advisable to set out the history of the plaintiff University in full detail.

1. The University of the State of Deseret was instituted and incorporated by an ordinance of the State of Deseret approved February 28, 1850, reading as follows:

"Sec. 1. Be it ordained by the General Assembly of the State of Deseret: That a University is hereby instituted and incorporated, located at Great Salt Lake City, by the name and title of the University of the State of Deseret.

"Sec. 2. The powers of the University shall be vested in a Chancellor and twelve Regents; the number of which Regents may be *increased when necessary,* who shall be chosen by the joint vote of both Houses of the General Assembly, and shall hold their office for the term of four years; and until their successors are qualified.

"Sec. 3. The Chancellor shall be the chief executive officer of the University, and chairman of the Board of Regents.

"Sec. 4. The Chancellor and Board of Regents are a body corporate, to sue and be sued; to act as Trustees of the University, to transact, or cause to

be transacted, all business needful to the prosperity of the University in advancing all useful and fine arts and sciences; to select and procure lands; erect and purchase buildings; solicit donations; send agents abroad; receive subscriptions; purchase books, maps, charts, and all apparatus necessary for the most liberal endowment of any library, and scientific institution; employ professors and teachers; make by-laws, establish branches of the University throughout the State; and do all other things that fathers and guardians of the Institution ought to do.

"Sec. 5. The Chancellor and Regents may appoint a Secretary, and define his duties.

"Sec. 6. The Chancellor, Regents, and Secretary, before entering upon the duties of their respective offices, shall each take an oath of office, and file a bond in the office of the Secretary of State, with approved securities, in a sum not less than ten thousand dollars, conditioned for the faithful performance of their several duties; which sum may be increased at the discretion of the Executive of the State.

"Sec. 7. There shall be a Treasurer of the University elected in the same manner, and for the same time as the Chancellors and Regents; whose duty it shall be to receive and safely keep the funds of the University, or dispose of the same, as he shall be directed by the Board of Regents; and keep accurate records of all funds that may come into his possession; and keep his books open at all times for the inspection of the Chancellor and Regents, or any of them, and of the Executive and Secretary of State.

"Sec. 8. The Treasurer, before entering upon the duties of his office, shall take an oath of office, and file a bond with approved security, in the office of the Secretary of State, in the sum of one hundred thousand dollars; conditioned for the faithful performance of his duties, which sum may be increased at the discretion of the Executive of the State.

"Sec. 9. Should a vacancy occur in the Board of Regents, or any office in the Institution, during the recess of the General Assembly the Executive of the State may fill such vacancy.

"Sec. 10. It shall be the duty of the officers of the University, to prepare and open books; and be ready to receive subscriptions, donations and appropriations, on or before the sixth day of April next; and shall legibly enter upon their books, all subscriptions and donations to the University, with the names of the donors, time and place, and preserve the same.

"Sec. 11. The Board of Regents shall have a seal, known as the seal of the University; which may accompany

all their official correspondence, and all other legal documents given under the hands of the Regency of the University.

"Sec. 12. It shall be the duty of the Chancellor and Board of Regents, as soon as the funds arising from donations or otherwise may justify, to establish a free school institution for the benefit of orphans, and other indigent worthy persons.

"Sec. 13. The Secretary and Treasurer shall each present a full and explicit report in writing of the situation, funds, and doings of the University in their several departments, by the fifteenth of October in each year, *to the Auditor of Public Accounts.*

"Approved Feb. 28th, 1850." (Emphasis added.)

2. The University was constituted a corporation de jure by the joint resolution legalizing the laws of the Provisional Government of the State of Deseret approved October 4, 1851, by the Legislative Assembly of the Territory of Utah as follows:

"*Resolved, by the Legislative Assembly of the Territory of Utah,* That the laws heretofore passed by the provisional government of the State of Deseret, and which do not *conflict with the 'Organic Act,'* of said Territory, be, and the same are hereby declared to be legal, and in full force and virtue, and shall so remain until *superseded by the action of the Legislative Assembly of the Territory of Utah.*

"Approved October 4, 1851." (Emphasis added.)

3. Its name was changed to the University of Utah by Ch. IX, Laws of Utah 1892, an act of the territorial legislature, approved February 17, 1892, as follows:

"Be it enacted by the Governor and Legislative Assembly of the Territory of Utah:

"Section 1. The name of the University organized under an act approved February 28th 1850, and laws amendatory of and supplementary to said act, shall hereafter be 'University of Utah,' and with and by said name it is constituted and continued a body corporate, with perpetual succession, and it may have and use a corporate seal, and by said name sue and be sued, and contract and be contracted with. It is vested with all the *property,* credits, effects and franchises, and is subject to all the contracts, obligations and liabilities of the existing corporation.

"It may take and hold to its use by purchase gift, devise or bequest, real and personal property and moneys credits and effects, and by sale or exchange receive and use the proceeds of property not applicable to its uses in specie. It shall *be deemed a public corporation and be subject to the laws of Utah, from time to time enacted,*

relating to its purposes and government, and its property, credits and effects shall be exempt from all taxes and assessments.

"Sec. 2. The University shall be the highest branch of the public system of education in Utah, and, as far as practicable its courses and methods of instruction shall be arranged to supplement and continue the instruction in other branches of the public system, and with a view to afford and complete a thorough education to students of both sexes in arts science and literature, and in such professional branches as may be included in its courses of instruction.

"Sec. 3. The government of the University and the management of its property and affairs is vested in a board of nine regents, five of whom shall constitute a quorum, and, except as herein provided, the term of office of each regent shall commence on the first day of July next after his appointment or election, and continue for six years and until a successor is appointed or elected and qualified. In 1892 nine regents shall be appointed, three of whom shall hold office from the time of appointment until July 1st 1894, three shall so hold until July 1st 1896, and three shall so hold until July 1st 1898, and each shall also hold until a successor is appointed or elected and qualified. After 1892, three regents shall be appointed or elected biennially. A vacancy in the office of a regent occurs by his permanent removal from Utah; by his incapacity to act; or by the acceptance of his resignation by the Governor, and the Governor may, by appointment, fill the vacancy for the remainder of the term and until a successor is appointed or elected and qualified. Each regent, before entering upon the duties of his office, shall take an official oath and give to the University a bond, with sureties approved *by the Secretary of Utah,* in the penal sum of one thousand dollars conditioned for faithful discharge of his duties, and the oaths and bonds shall be filed in the office of said Secretary. No regent shall be directly or indirectly interested in any contract, involving any pecuniary compensation or benefit, made by or in behalf of said University, or receive any compensation for his services as regent, but regents may be allowed actual expenses incurred in attending meetings of the board or its committees, or in attending to the business of the University under authority granted by the board or its committees.

"Sec. 4. The regents shall appoint one of their number chancellor and he shall hold the appointment two years and until a successor is appointed, he shall act as chairman and be the executive officer of the board. They shall also appoint a secretary, who may be a

regent, and a treasurer who shall not be a regent and may define their duties and require bonds to the University and fix the amount thereof for the faithful discharge of their duties. Bonds taken by the University to secure the faithful discharge of official duties, shall be copied in the regents record book, and in case of the loss or destruction of any bond the record shall be prima facie evidence of its contents and execution as the same appear in the record. The regents shall make a *biennial report to the Governor and Legislature during the first ten* days of each session, (not special) showing the condition, income and expenditures to the end of the preceding fiscal year, with an additional general statement of its affairs from the end of the fiscal year to the 31st of December prior to the meeting of the Legislature, and with estimates of the income and expenses for the remainder of the fiscal year and for the ensuing two fiscal years, with such other statements and recommendations as they may deem useful.

"Sec. 5. The normal school shall be continued, as a department of the University, for students of both sexes, and its course of instruction may extend to a period of four years or until graduation, and its course shall include practice in teaching and instruction in pedagogy. Students selected for the normal department, as now pro-vided by law, may be examined before admission and rejected unless found qualified to enter upon the normal course of instruction prescribed by the University. Graduates in the normal course shall receive a certificate which, for the term of five years thereafter, shall be sufficient evidence of the holder, without examination as to scholarship, to teach in the common schools in the grade or grades mentioned in the certificate, and the University may provide for granting a degree to graduates in the normal course who have satisfactorily taken a course of studies prescribed, and leading to the degree, and the degree shall be sufficient evidence of the holder to thereafter teach in the common schools, without examination as to scholarship.

"Sec. 6. The school for deaf mutes shall remain a department of the University until separated therefrom, as may be provided by law.

"Sec. 7. The military department, as now organized, shall be continued until the end of the academic year in June 1894, and thereafter it may be continued or abolished, or continued as to certain classes with exemptions, to other classes, as the regents may deem best.

"Sec. 8. A course of studies preparatory to regular university courses may be maintained for such length of time as the regents think it necessary

416

to fit students for the university courses.

"Sec. 9. Instruction in the preparatory, normal, and regular university courses shall be free to actual residents of Utah, but an entrance fee not to exceed ten dollars for residents, and not to exceed fifty dollars, for non-residents of Utah, may be required, and the regents may fix a reasonable charge for instruction in special studies not embraced in regular courses, and for postgraduate instruction. No partisan political, or sectarian religious doctrine shall be taught or inculcated in the University, and no political or religious tenet shall be required as a qualification of any student, instructor, officer or employee of the University.

"Sec. 10. The fiscal year of the University shall hereafter commence on the 1st day of July and end on the 30th day of June in each year, and biennial appropriations for maintenance shall be deemed to be for the two years beginning on the 1st day of July next after the appropriations are made, unless otherwise specified, and the proper pro rata thereof may be drawn from the Treasurer of Utah, quarter yearly in advance, on Auditors warrants.

"Sec. 11. The regents may adopt by-laws and from time to time repeal, amend or add to them, and therein provide for the organization of the board; for its general and special meetings; for the distribution of the business of the university to committees; for an executive committee of five of its members a majority of whom shall constitute a quorum having the powers of the board in the ordinary business of the University between meetings of the board.

"The board shall employ and appoint a President of the University, and employ or provide for the employment of all instructors and employees. They may provide for the organization of a faculty of the instructors of which the President shall be the chairman and executive officer, and they may commit to the faculty the general management and control of instruction, and the exercise of such powers regarding the examination, admission, classification and instruction of students as the regents may deem proper. All contracts hereafter made with instructors and other employees, whether for a definite or indefinite time, shall be subject to termination at any time at the will of the regents or their executive committee when in their judgment the interests of the university require it.

"Sec. 12. The University may grant degrees, to students who have satisfactorily completed any of its prescribed courses of study, and *it may also grant a special honorary or emeritus degree to any former member of its faculty, for long or eminent*

*scrvice in the University, but no other honorary degree shall be granted.*

"Sec. 13. Sections 1835, 1836, 1841, and the last period of eight lines of Section 1845 of the Compiled Laws of 1888, and all other laws relating to the University in conflict with the provisions of this act, are hereby repealed.

"Sec. 14. This act shall take effect from the date of its approval.

"Approved February 17, 1892." (Emphasis added.)

Appellants contend that the only rights, immunities, franchises and endowments perpetuated to the University were the rights which existed prior to the adoption of the Constitution as those rights were conditioned, limited and circumscribed by territorial legislation.

Respondent contends that the rights, immunities, franchises, and endowments granted in Chapter IX, Laws of 1892 freed from conditions and limitations vested in the University to the same effect as if no condition or limitation had been included in the territorial legislation.

This court is not called on to decide which is better, an autonomous University or a legislatively controlled University. It is our duty to give proper effect to the language of the Constitution and the territorial statute bearing on the question.

The rights, immunities, franchises and endowments which Respondent claims must be found in Chapter IX, Laws of 1892 set out in full herein. That act repealed all other laws in conflict with its provisions. Section 1 of said act provided: That the name of University of the State of Deseret should thereafter be "University of Utah." The University was constituted and continued a body corporate with perpetual succession. It was vested with all the property, credits, effects and franchises of the existing corporation, subject to all the contracts, obligations and liabilities of the same. "It shall be deemed a public corporation and be subject to the laws of Utah, from time to time enacted, relating to its purposes and government : * * *."

Respondent contends that the language constituting the University a body corporate with perpetual succession, and declaring that it should be deemed a public corporation, were rights perpetuated by the Constitution, but that the words: *"and be subject to the laws of Utah, from time to time enacted, relating to its purposes and government"* were not a part of any right, immunity, franchise or endowment and were not perpetuated by the Constitution.

Appellants contend that the language: *"and be subject to the laws of Utah,* from time to time enacted, relating to its purposes and government," conditions every right, immunity, franchise and endowment mentioned in Chapter IX, Laws of 1892, and that the words are part and parcel of the rights.

Respondent urges that the words: "and be subject to the laws of Utah, from time

to time enacted, relating to its purposes and government," are of no significance since the Legislative Assembly had the right to amend or repeal the *corporate* privileges and other rights granted without an express reservation of that right. The question then arises, why did the 1892 Legislative Assembly use the quoted language if it was unnecessary? We must assume that the Assembly knew that it was empowered to amend or repeal the act upon which respondent relies for its rights. We believe that the language declaring that the University should be subject to the laws of Utah from time to time enacted was used in Section 1 for the purpose of doing what appears to have been intended, to-wit: To make the University subject to the laws of Utah from time to time enacted.

Respondent directs our attention to the provisions of the Constitutions of Minnesota and Idaho and observes that identical constitutional phraseology protects the Universities of Minnesota, Idaho and Utah. Although we have set out our Article X, Section 4 herein, we shall again set it out along with the constitutional provisions of Minnesota and Idaho set out by respondent:

*"The location and establishment by existing laws of the University of Utah,* and the Agricultural College *are hereby confirmed, and all the rights, immunities, franchises and endowments heretofore granted or conferred, are hereby perpetuated unto said University* and Agricultural College respectively." Utah Article X, Section 4.

*"The location of the University of Minnesota, as established by existing laws, is hereby confirmed,* and said institution is hereby declared to be the University of the State of Minnesota. *All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby perpetuated unto the said university;* and all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section." Minnesota Article VIII, Section 4, M.S.A.

*"The location of the University of Idaho, as established by existing laws, is hereby confirmed. All the rights, immunities, franchises, and endowments, heretofore granted thereto by the Territory of Idaho are hereby perpetuated unto the said university.* The regents shall have the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, under such regulations as may be prescribed by law. No university lands shall be sold for less than ten dollars per acre, and in subdivisions not to exceed one hundred and sixty acres, to any one person, company or corporation." Idaho Article IX, Section 10. (Emphasis added.)

The University of Minnesota was created a corporation by Chapter 3, Laws of Territory of Minnesota 1851, M.S.A. note preceding section 137.01, which declared:

"Be It Enacted By The Legislature

Assembly of The Territory Of Minnesota, * * *."

Section 4 of the act declared that "the *government* of this University shall be vested in a Board of twelve Regents who shall be elected by the Legislature * *."

Section 2 provided that "the proceeds of all land that may hereafter be granted by the United States to the Territory for the support of a University, shall be and remain a perpetual fund, to be called the 'University Fund,' the interest of which shall be appropriated to the support of a University * * *."

Section 7 provided that "the Regents of the University and their successors in office, shall constitute a body corporate, with the name and style of the 'Regents of the University of Minnesota,' with the right as such, of suing and being sued, of contracting and being contracted with, of making and using a common seal, and altering the same at pleasure."

Section 9 gave the Regents power and made it their duty *"to enact laws for the government of the University"* and authorized them to appoint professors and "such other officers as they may deem expedient."

Section 12 provided that "the admission fee to the University and the charges for tuition in the several Departments thereof, shall be regulated and prescribed by the Board of Regents; and as soon as in their opinion, the income of the University fund will permit, tuitions in all of the Departments shall be without charge to all students in the same, who are residents of the Territory."

Section 13 provided that "the Regents as soon as they may deem expedient, shall procure a suitable site for the erection of the University buildings, and they may proceed to the erection of the same as soon as funds may be provided for that purpose, after such plan or plans as may be approved by a majority of said Board."

Section 15 provided that "the Regents are authorized to expend such portions of the fund, which by the provisions of this act, *may come under their control,* as they may deem expedient for the erection of suitable buildings, and the purchase of apparatus, a Library, and a Cabinet of Natural History; and the *selection, management and control of all lands, which may hereafter be granted by Congress* for the endowment of said University, is hereby *vested in the Board of Regents.*"

Section 20 provided: "The Legislative Assembly may at any time, alter, amend, modify or repeal this act." (Emphasis added.)

The Supreme Court of Minnesota in the case of "State ex rel. University of Minne-

420

sota v. Chase"[1] considered Chapter 3, Territorial Laws 1851 and said:

> "Section 20 reserved to the legislative assembly the right at any time to alter, amend, or repeal the act.
>
> "So the regents were made a 'body corporate' with power to *govern;* that is, the power to control. 4 Words and Phrases [1 Ser.] 3139. As applied to corporations, it is the power of management. *The University continued under the act of 1851 until the coming of statehood in 1858. * * *"* (Emphasis added.)

The Minnesota Court then held that the powers granted by Chapter 3, Territorial Laws of Minnesota, 1851 were confirmed and perpetuated by the Constitution beyond the power of the Legislature to alter, amend or repeal.

We cannot agree that the result and conclusion reached by the Minnesota court should follow here.

Note should be made of differences in the constitutional sections set out above. Article VIII, Section 4 of the Constitution of Minnesota provides *"and all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section."* (Emphasis added.)

No such language is found in Article X, Section 4 of our Constitution. In fact as will be hereafter observed, the lands granted by Congress for the support of the University of Utah are vested by the Constitution in the State of Utah.

It should be further observed that by the Territorial Act the Regents of the University of Minnesota were given power not granted by the Utah Territorial Act of 1892.

Section 15 of the Territorial Act of Minnesota provided that "the *selection, management* and *control* of all lands, which may hereafter be granted by Congress for the endowment of said University, *is hereby vested in the Board of Regents."*

No such power was given the Regents of the University of Utah under the Territorial Act of 1892.

We are likewise constrained to the view that Section 20 of the Minnesota Act providing: "The Legislative Assembly may at any time, alter, amend, modify or repeal this act" is not equivalent to the provision contained in Section 1 of Chapter IX, Utah Territorial Laws 1892.

The Utah Territorial Act of October 4, 1851, contained a provision similar to the provision in the Minnesota act, declaring that the laws of the State of Deseret should remain in full force "until superseded by the action of the Legislative Assembly of the Territory of Utah." The Territorial Assembly in 1892 acted upon the rights of the University and changed its name and declared it to be a public corporation "subject to the laws of Utah, from time to time enacted, relating to its purposes and

1. 175 Minn. 259, 220 N.W. 951, 953.

government." The holding of the Minnesota court would be more persuasive if the Minnesota Act of 1851 had declared the University of Minnesota shall be deemed a public corporation and shall be subject to the laws of Minnesota from time to time enacted.

But by Chapter 3 of the Minnesota Territorial Laws of 1851, the University of Minnesota was not in its purposes and government made subject to the laws of Minnesota from time to time enacted.

The Minnesota act contains only a reservation of power to alter, amend, modify or repeal. Section 20 is in the nature of a right reserved by the Territorial Assembly to abrogate the rights granted. Whereas, the provision in the Utah Territorial Act of 1892, making the University subject to the laws of Utah from time to time enacted, was quite different. The language was part and parcel of the act creating the University a public corporation. It in effect declared this is the status and these are the powers of the University but they are not static, they are subject to the laws of Utah from time to time enacted. It in effect declared the University is a public corporation, but not a corporation above the Legislature. It shall always be subject to the laws of Utah.

Had Chapter IX, Laws of 1892 used the language used in the Minnesota Territorial Act, and had no amendment been made to it before statehood, reasoning such as was used by the Supreme Court of Minnesota would be more persuasive. The only limitation placed on the University of Minnesota by its original charter was Section 20, which reserved to the Territorial Assembly the right at any time to alter, amend or repeal the act. The charter did not make the University of Minnesota in its purposes and government subject to the laws of Minnesota from time to time enacted. The powers granted to the University of Minnesota by its 1851 Charter were not added to or amended in any respect before statehood, and the right reserved to the Legislative Assembly to alter, amend, modify or repeal expired by its own terms when the State of Minnesota came into existence. Thereafter there was no Legislative Assembly to alter, amend or repeal, but a State Legislature.

The provisions of Chapter IX of our Territorial Act of 1892 created a concurrent condition to the granting of powers, and the powers granted are limited by the condition. The 1892 Act did not grant rights subject only to abrogation as was the case in the Minnesota Act, rather rights were granted subject to a condition, and it was these conditioned rights that were perpetuated by Article X, Section 4 of the Utah Constitution.

A further distinction should be observed between the Enabling Acts and certain constitutional provisions of Utah and Minnesota.

The Enabling Act of Utah in Section 11 provides: "The schools, colleges, and uni-

422

versity provided for in this Act *shall forever remain under the exclusive control of said State,* * * *."* (Emphasis added.)

Article X, Section 5 of the Constitution of Utah provides that: "The proceeds of the sale of lands reserved by an Act of Congress, approved February 21st, 1855, for the establishment of the University of Utah, and of all lands granted by an Act of Congress, approved July 16th, 1894, shall constitute permanent funds, to be safely invested *and held by the State;* and the income thereof shall be used exclusively for the support and maintenance of the different institutions and colleges, respectively, *in accordance with the requirements and conditions of said Acts of Congress."* (Emphasis added.)

In marked contrast to Utah's Enabling Act and Constitution are the Enabling Act and Constitution of Minnesota. The Minnesota Enabling Act, § 5, subd. 2, provides: "That seventy-two sections of land shall be set apart and reserved *for the use and support of a State university,* * * *."* Article VIII, Section 4 of the Constitution of Minnesota provided that "all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section." (Emphasis added.) Neither the Minnesota Enabling Act nor the Minnesota Constitution provides that the University shall forever remain under exclusive control of said State.

Article IX of Section 10 of the Idaho Constitution, like the Constitution of Minnesota, and unlike Article X, Section 4 of the Constitution of Utah, vests extensive power in the Regents of the University of Idaho. They were given general supervision of the University, and the control and direction of all the funds of, and appropriations to the University.

The University of Idaho was established at Moscow, Idaho by the act of the Territorial Legislature January 30, 1889. The act vested the government of the University in a Board of Regents. The regents were given "the custody of the books, records, buildings and other property of said University." The Board of Regents were authorized to "enact laws for the government of the University in all its branches, * * *." The act ordered the collection of an annual tax, which, when so levied and collected, "shall be appropriated to a University Building Fund, to remain in the Treasury *subject to the orders of the Board of Regents;* * * *."* (Emphasis added.)

The act was not amended or repealed before statehood.

The Idaho Constitution was ratified November 5, 1889.

In the case of Dreps v. Board of Regents of the University of Idaho,[2] the Idaho Court after quoting Section 10 of Article IX of the Constitution, said:

"The foregoing provision of the constitution, ratified and approved by the

2. Idaho, 139 P.2d 467, 470.

people of the state, definitely fixed the location of the University of Idaho as established by existing laws and then provided, *'All the rights, immunities, franchises, and endowments, heretofore granted thereto by the territory of Idaho are hereby perpetuated unto the said university'*. By this provision the territorial act, creating the university and prescribing the powers, duties and authority of the Board of Regents was written into the constitutional corporate charter of the university as fully as if it had been set out at length in the constitution. * * *" (Underscoring added.)

If we apply the language of the Idaho Court to this case, the Utah Territorial Act of 1892, creating the University of Utah and prescribing the powers, duties and authority of the Board of Regents, was written into the constitutional corporate charter of the University of Utah *as fully as if it had been set out at length in the Constitution.*

If Chapter IX, Territorial Act of 1892 be considered as set out at length in Article X, Section 4 of the Utah Constitution, the words, *subject to the laws of Utah from time to time enacted* are as much a part of Section 4, Article X of the Utah Constitution as any other language in Chapter IX, Territorial Laws of Utah 1892.

The language, "subject to the laws of Utah, from time to time enacted, relating to its purposes and government" contained in the act of 1892 was continued as a condition to the power granted. As to the meaning of Article X, Section 4, it must be conceded that the section related the rights, immunities, franchises and endowments to existing law which made the University subject to the laws of Utah from time to time enacted.

Respondent suggests that Article IX, Section 10 of the Idaho Constitution may have been a model for our Article X, Section 4. The first sentence of the Idaho Constitution, Article IX, Section 10 is substantially the same as our Article X, Section 4. Section 10 of Article IX of the Idaho Constitution provides further—"The regents shall have the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, * * *."

The grant of powers to the Regents of the University of Idaho argues strongly for the automony of that University. But the failure to adopt the second sentence of Article IX, Section 10 of Idaho's Constitution as a part of our Article X, Section 4 is a strong argument that the framers of the Utah Constitution did not intend to vest in the Board of Regents of the University of Utah "the general supervision of the university, and the control and direction of all funds of, and appropriations to, the university."

The framers of the Utah Constitution failed to specifically declare, as was done in Idaho, that the Regents should be vested with the control and management of the

424

University and failed to vest in the institution, as did Minnesota, all lands to be granted by Congress.

It may be observed that no university has been held to be freed from legislative control where the identical language contained in Article X, Section 4, Utah Constitution is found, without more. Every university which has been held to be autonomous has language in the Constitution like Idaho and Minnesota granting powers not contained in Article X, Section 4, Utah Constitution.

The following statement appears in respondent's brief: "The following institutions are constitutional corporations: University of Michigan; Michigan State College of Agriculture and Applied Science; University of Minnesota; University of Colorado; University of Idaho; Oklahoma Agricultural and Mechanical College; University of California; University of Georgia; and University of Utah."

The constitutions of the states wherein said institutions are located, respecting said universities and colleges, are different in form and substance from Article X, Section 4, Utah Constitution, and each carries specific provisions granting control and management of the university to the regents or vesting the lands granted by Congress or the proceeds thereof and other donations in the university.

*Michigan Constitution 1850*, Article 13, Section 8, provides: "The board of regents shall have the general supervision of the university, and the direction and control of all expenditures from the university interest fund."

*Michigan Constitution of 1908*, Article 11, Section 8—"The board shall have the general supervision of the college, and the direction and control of all agricultural college funds; and shall perform such other duties as may be prescribed by law."

*Minnesota Constitution*, Article VIII, Section 4, provides: (heretofore set out.)

*Colorado Constitution*, Article IX, Section 14, provides: "The board of regents shall have the general supervision of the university, and the exclusive control and direction of all funds of, and appropriations to, the university."

*Idaho Constitution*, Article IX, Section 10—(Heretofore set out.)

*Oklahoma Constitution 1907*, Article 6, Section 31—"A Board of Agriculture is hereby created to be composed of eleven members, all of whom shall be farmers * * *. Said Board shall be maintained as a part of the State government, and shall have jurisdiction over all matters affecting animal industry and animal quarantine regulations, and shall be the Board of Regents of all State Agricultural and Mechanical Colleges, and shall discharge such other duties and receive such compensation as may be provided by law."

*California Constitution 1879*, Article IX, Section 9—"The University of California shall constitute a public trust, to be administered by the existing corporation known as 'the Regents of the University

of California,' *with full powers of organiza-tion and government,* subject only to such legislative control as may be necessary to insure compliance with the terms of the endowments of the university and the security of its funds. * * * *Said corporation shall be vested with the legal title and the management and disposition of the property* of the university and of property held for its benefit * * *." (As amended November 5, 1918.) (Emphasis added.)

*Georgia Constitution,* Article VIII, Section 4, Par. 1—"There shall be a Board of Regents of the University System of Georgia, and the government, control, and management of the University System of Georgia and all of its institutions in said system shall be vested in said Board of Regents of the University System of Georgia. * * *"

It should be further observed that the Michigan Constitution of 1850, Article 13, Section 6, provided for the election of the Regents of the University of Michigan; and that the Michigan Constitution of 1908, Article 11, Section 7, provided for the election of the State Board of Agriculture; and the Constitution of Colorado, Article IX, Section 12, provides for the election of the Regents of the University of Colorado, thus further distinguishing those institutions from the University of Utah, whose Regents are appointed by the Governor.

We are constrained to the view that the University of Utah is not brought into the group of constitutional corporations mentioned by respondent when there exists such differences between the Utah Constitution and the constitutional provisions affecting the other universities mentioned.

If the framers of the Utah Constitution had intended to create the University of Utah a constitutional corporation, completely autonomous and free from legislative control, it is difficult to understand why language such as was used in the constitutions of Michigan, Minnesota and the other constitutions referred to was not used.

Had the framers of the Utah Constitution added after "respectively" in Article X, Section 4: The Board of Regents of the University of Utah shall have general supervision of the University and the direction and control of all expenditures from the University Interest Fund, or All lands which may be granted hereafter by Congress, or other donations for said University purposes, shall vest in the University of Utah, we would be presented with language supporting respondent's argument.

That the framers of the Utah Constitution did not adopt language similar to the constitutions of Minnesota and Idaho, even though the Convention had before it the constitutions of those states is evidence that a different result was intended. Respondent relies heavily on the University of Michigan as supporting the argument for like result in the instant case. The

framers of the Utah Constitution did not adopt language similar to that found in the Michigan Constitution, even though that language had been held by the Michigan court in 1893 to constitute the University of Michigan a constitutional corporation free from legislative control.[3]

We are, therefore, of the opinion that the language used in Article X, Section 4, Constitution of Utah, is not so clear that it can be said that it created the University a constitutional corporation completely freed from legislative control. Rather, we are inclined to the view that the language failed to create the University a constitutional corporation free from legislative control. But if we accept the view that there is present some ambiguity and some justification for diverse opinions, we may look to other sources of interpretation to clarify the instrument.

We must bear in mind that our Constitution is not one of grant, but one of limitation. Consequently, in order that the legislative body be restricted in educational as well as all other matters, it is imperative that the Legislature be restricted expressly or by necessary implication by the Constitution itself. This court in the case of Kimball v. Grantsville City [4] said:

"* * * The state having thus committed its whole lawmaking power to the legislature, excepting such as is expressly or impliedly withheld by the state or federal constitution, it has plenary power for all purposes of civil government. Therefore, in the absence of any constitutional restraint, express or implied, the legislature may act upon any subject within the sphere of the government * * * and, whenever an inquiry is directed questioning the constitutionality of a legislative enactment, it is for him who asserts its invalidity to show that it is forbidden."

This court in the case of Spence v. Utah State Agricultural College,[5] at pages 111, 112 of 119 Utah, at page 22 of the 225 P.R. observed:

"* * * Accordingly it would require positive pronouncements in the Constitution before we would find that the members of the Constitutional Convention intended to forever close the door on the right of subsequent legislatures to increase the number of trustees.

"A doctrine firmly established in the laws of most jurisdictions is that a state constitution is in no manner a grant of power, it operates solely as

3. Weinberg v. Regents of University of Michigan, 97 Mich. 246, 56 N.W. 605.

4. 19 Utah 368, 57 P. 1, 4, 45 L.R.A. 628. See, also, Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400.

5. 119 Utah 104, 225 P.2d 18.

a limitation on the legislature, and an act of that body is legal when the constitution contains no prohibition against it. This state is committed to that doctrine."

This court further observed in that case, at page 111 of 19 Utah, at page 22 of 57 P.:

"The constitutional article does not specifically fix the number of members, and, while the article does make mention of perpetuating the rights, franchises, immunities and endowments previously granted, its wording does not, even by implication, suggest an intent to oust the legislature from ever dealing with any affairs of the college, be the dealing favorable or prejudicial to its welfare."

There is not in Article X, Section 4, or elsewhere in the Constitution of Utah any express prohibition against action by the legislature respecting the University. Nor do we believe that the Constitution contains any implied restraint against such action.

Attention should be called to Article XXIV (Schedule) Section 2 of the Utah Constitution, which declared: "All laws of the Territory of Utah now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed by the Legislature."

Can it be assumed that the framers of the Constitution did not consider that Chapter IX, of the Territorial Act of 1892, including the words, "subject to the laws of Utah, from time to time enacted," would remain in full force until action was taken by the State Legislature?

The root of the dispute between the parties lies in legislative enactments since statehood *which plaintiff objects to* on the ground that the acts complained of are unconstitutional as an interference with the sovereign rights which plaintiff contends were conferred by Article X, Section 4 of the Utah Constitution. But, as heretofore observed, the said legislative enactments must be sustained unless it can be clearly demonstrated that they are expressly or impliedly prohibited by the Constitution itself. In 11 Am.Jur., Title Constitutional Law, Section 128, page 780, it is said:

"The general principle has been expressed in many different forms. It has been declared that in no doubtful case should the courts pronounce legislation to be contrary to the Constitution; that to doubt the constitutionality of a law is to resolve every or all doubt in favor of its validity; * * *."

■ A cardinal rule of constitutional construction is that the words must be construed in the light of what was intended by the framers of the instrument. In

428

the case of State ex rel. v. Eldredge[6] this court said:

"* * * In construing the supreme law, the meaning of the framers must be ascertained from the whole purview of the instrument, and, in construing a particular section, the court may refer to any other section or provision to ascertain what was the object, purpose, and intention of the Constitution makers in adopting such section. * * *"

■ If there is no ambiguity as to the status of the University and its powers; if there is no uncertainty as to the controls (if any) on the University; if all the provisions of the Constitution are crystal clear as to those powers and controls, then extraneous or contemporaneous construction may not be resorted to. But if the words are ambiguous or their meaning not clear, or if the several provisions of the basic instrument are susceptible to two or more possible meanings or constructions, then it is proper to look outside the instrument itself to ascertain what the framers meant by the language used.

In 16 C.J.S., Title Constitutional Law, § 32, page 70, it is said:

"In determining the meaning of an ambiguous constitutional provision the courts may properly seek extrinsic aid by ascertaining the construction given such provision at the time of its adoption and since by those whose duty it has been to construe, execute, and apply it in practice. * * *"

In 16 C.J.S., Title Constitutional Law § 33, page 72, it is said:

"Subject to the limitations discussed in the preceding section, a contemporaneous legislative or executive construction is entitled to, and will be given, serious consideration by the courts in determining the meaning of an ambiguous constitutional provision, both as a matter of policy, and also because it may be presumed to represent the true intent of the instrument. In doubtful cases such a construction should, and ordinarily will, be followed, unless it is manifestly erroneous. Reasonable, and it has been said, wide latitude should be allowed the legislative department in interpreting a constitutional provision. So, where a state constitutional provision is susceptible of two reasonable constructions, the action of the legislature in adopting one of those constructions is sometimes deemed conclusive."

In 16 C.J.S., Title Constitutional Law, § 34, page 74, it is said:

"Long acquiescence by the people in legislative or judicial construction of constitutional provisions is entitled to great weight with the courts.

"A contemporaneous uniform legislative or executive construction of constitutional provisions, adopted and act-

6. 27 Utah 477, 76 P. 337, 339.

ed on with the acquiescence of the people for many years, is entitled to great weight with the courts, * * *. Such construction, however, is not necessarily controlling, and plain, direct, and unambiguous provisions of a constitution cannot be modified or amended by practice or custom, no matter how long continued. * * *"

There is abundant contemporaneous construction of Article X, Section 4, inconsistent with or in direct contradiction of the position of the University. In fact, as heretofore observed, action was brought to have the court declare that substantial legislation enacted since statehood and to which there has been no objection by the University, be declared beyond the power of the Legislature to enact, notwithstanding the University has acquiesced for over 50 years with certain legislation now most criticized and objected to.

In the first legislative session after the adoption of the Constitution, and within a few months after Utah became a state, there was enacted Chapter 83, Laws of 1896 dealing with the University and its management. It was stipulated that this act was virtually a reenactment of the 1892 law (set out in full herein) without material change so far as the present action is concerned, except that Section 6, relating to the school for deaf mutes, was omitted from the 1896 law. In Section 1 of the 1896 act it was declared,

"It shall be deemed a public corporation and be subject to the laws of this State, from time to time enacted, relating to its purposes and government, * * *."

The 1896 act vested the control of the University in a board of nine regents; the same number provided for in the 1892 act.

This act was passed unanimously in both houses of the Legislature and the records show that 11 members of the Constitutional Convention were present in the 1896 Legislature and all voted for this act.[7] It is apparent that these delegates to the Constitutional Convention did not feel restrained by Section 4, Article X of the Constitution. It is further disclosed by the records that 10 of the 11 in the 1896 Legislature had voted for Article X, the Education Article, as it was finally adopted.[8] If the framers of the Constitution had intended that the Legislature be restrained in matters relating to the University, it is difficult to understand the silence of these delegates to the Constitutional Convention. But no objection was voiced to the act which declared that the University should be subject to the laws of Utah from time to time enacted. This

7. House Journal 1896, p. 395; Senate Journal 1896, pp. 264, 417.

8. II Proceedings Constitutional Convention, p. 1374.

430

act and other enactments containing the words, "subject to the laws of this State, from time to time enacted" are the ones about which the University now complains. Section 75–4–1 to 38, Utah Code Annotated 1943, now 53–31–1 to 41, Utah Code Annotated 1953, is the 1896 act as amended to date and contains the following section:

"53–31–2. The university shall be subject to the laws of this state now existing or hereafter enacted relating to its purposes and government."

Nor need we rely alone upon this chapter of the 1896 legislation. Chapter 119, Laws of Utah 1896 directed the University Board of Regents and the treasurer of the University to turn over to the State Board of Land Commissioners all moneys and evidence of indebtedness in their possession or under their control arising out of the sale of University lands within this State. This act referred to an act of the 1896 Legislature " * * * creating and defining the powers and duties of the State Board of Land Commissioners, providing for the selection, location, appraisement, protection, sale, rental and general management of the public lands of the State, and for the investment of the funds arising from the sale and leasing of such lands, * * *." The act referred to in Chapter 119, Laws of 1896 is Chapter 80, Laws of Utah 1896. Chapter 119 was passed unanimously [9] with not one of the members who had been in the Constitutional Convention voicing any objection.

Nor do we find a different attitude on the part of the University than was exhibited by the former members of the Constitutional Convention who were members of the first Legislature after statehood. For over 50 years the University has never raised the point of independent control, but during the period has accepted the declaration contained in Section 1, Chapter 83, Laws of 1896, that it "should be subject to the laws of this State" and has acquiesced in and complied with the legislative enactments relating to its purposes and government.

In fact, the University by its counsel has in the past adopted a position, contrary to its present position, which recognized legislative control.

In the case of State ex rel. University of Utah v. Candland, State Board of Land Commissioners,[10] the question presented was whether a legislative enactment directing the Board of Land Commissioners to convert certain investments of the University of Utah permanent land fund into cash and to pay the same toward the erection of a central building on the University Campus was unconstitutional because it increased the debt of the State beyond the constitutional limit. The University through its counsel, C. S. Varian, a member of the

9. House Journal 1896, p. 683; Senate Journal 1896, pp. 608 and 609.

10. 36 Utah 406, 104 P. 285, 287, 24 L.R.A., N.S., 1260.

Constitutional Convention, and one who voted for the adoption of Section 4, Article X as it now reads, contended that since the Legislature had passed a law directing the defendant to pay the proceeds of said investments to the University, that defendant was not in a position to challenge the constitutionality of the act as defendant had only a ministerial duty to perform since, " 'the state by its Legislature, through and by means of this law regularly enacted, *is dealing with its own property'* * * *." (Emphasis added.) The court held that the debt, although purporting to be a debt of the University, was in reality a debt of the State and hence unconstitutional. The court said at pages 425–426 of 36 Utah, at page 293 of 104 P.:

> " * * * The University of Utah, as a state institution, is given the use of the fund mentioned in the act, while the state assumes the debt and is obligated to pay it. While it is true that the university is a corporation and thus constitutes a legal entity with a limited capacity, yet, *when all of the provisions of law, which in some way relate to and affect the government of the university are considered and construed together, it is made very clear that the corporation* designated the University of Utah was created and exists for the sole purpose of more conveniently governing and conducting the educational institution called the 'University.' The university is clearly a state institution, and is so treated, since the members constituting its governing board are all appointed by the Governor with the consent of the senate, and the board regularly reports to the Governor. Moreover, the corporation holds all the property in trust merely. *In fact the property belongs to the state of Utah. We think no one will seriously contend that the corporation styled the 'University of Utah' has the power or authority, without the consent of the state of Utah, to dispose of any property.* While the naked legal title to the buildings and paraphernalia may be vested in the corporation, it is, nevertheless, held in trust for the state of Utah, which is obliged to hold and use and maintain it for school purposes. The real ownership is thus in the state, and if the university property is destroyed from any cause it is the loss of the state, and the burden of restoring it must, as it should, fall upon the state at large. The state also must provide the necessary funds to conduct and maintain the university by the same means and in the same manner that all other state institutions are maintained. The state trust funds now are, and perhaps always will be, entirely insufficient for this purpose." (Emphasis added.)

Other statutes have been passed relating to the purposes and government, which should be mentioned without any extensive discussion.

(a) Section 3 of the 1892 act set out herein provided that the Board of Regents con-

sists of nine members with six year terms. Section 3 of Chapter 83, Laws of Utah 1896 contained the same provisions. Chapter 36, Laws of 1911 provided for 12 regents in addition to the Secretary of State with four-year terms, while Chapter 133, Laws of 1945 added the President of the University Alumni Association as an ex officio member. The University has made no objection to the action of the Legislature in increasing the number of regents; in fact, this action was instituted through such a board.

(b) Many statutes have been passed since statehood restricting the giving of certain courses of study and mandating the giving of others. By Chapter 133, Laws of 1905, the University was prohibited from including in its courses agriculture, horticulture, animal industry, veterinary science, domestic science and art (except in connection with the normal course). In 1921 c. 116, the University was prohibited from awarding degrees in domestic science or art. In 1923, c. 4, the University was required to give instruction in the Constitution of the United States.

(c) Chapter IX, Laws of 1892 and Chapter 83, Laws of 1896 authorized the University to "grant a special honorary or emeritus degree to any former *member* of its faculty, for long or eminent service in the University,' *but no other honorary degree shall be granted.*" However, Chapter 103, Laws of 1919 authorized the University to grant honorary degrees to "persons who are worthy of the same."

(d) Chapter IX, Laws of 1892 and Chapter 83, Laws of 1896, (Section 9) provided that instruction in preparatory, normal and regular university courses be free to residents of Utah. The Regents were authorized to charge an entrance fee to residents not to exceed $10.00 and to non-residents not to exceed $50.00. They were authorized to fix reasonable charges for special studies and post graduate instruction. Since 1896 legislation has been enacted regulating the amount of student tuition and fees. Likewise, laws have been enacted regulating the disposition of the fees and tuition, which, by Chapter 30, Laws of 1915, were required to be deposited in the State Treasury monthly.

(e) By Chapter IX, Laws of 1892 and Chapter 83, Laws of Utah 1896, the University was empowered to draw from the Treasurer of Utah quarter yearly in advance on auditor's warrant the proper pro rata of its biennial appropriations for maintenance. By Chapter 53, Laws of Utah 1899, the Legislature amended the former laws by providing that the board of control of each state institution must make requisition upon the state auditor for a warrant in sufficient amount to pay the audited bills for the previous month. From 1899 up until 1921 the Board of Regents were required to requisition warrants on the University's biennial appropriations by submitting verified itemizations of bills for the previous month.

Attention should be called to some of the early enactments concerning the *purposes*

and *government* of the University in order to determine if the University and its Regents interpreted Article X, Section 4 as respondent now contends it should be interpreted.

Chapter 65, Laws of Utah 1897 at page 248 provides for appropriations for University as follows:

"Appropriations

"To the University of Utah:

"For general maintenance for the two academic years ending June 30, 1899, or so much thereof as may be necessary ................$73,000.00

"*Provided,* that no officer or member of the faculty of said University, for all service *rendered to the State* during the term herein named shall be paid any salary in excess of $2,500.00 per annum. * * *

"Section 2. The State Auditor is authorized and required to recover into the State Treasury all unexpended balances of appropriations made by the first State Legislature for the year 1896, after all legal claims chargeable to the several appropriations are fully discharged and satisfied, and to balance the several accounts on his books · by charging the same and crediting the appropriation account.

"Section 3. It shall be unlawful for · any State officer or State board of any institution of the State to incur or contract for any indebtedness in excess ·of the appropriations herein provided,

except by and with the *consent of the State Board of Examiners previous to incurring or contracting for any such indebtedness.*

"Section 4. It shall be unlawful for the State Auditor to audit or draw a State warrant in payment of any claim against the State, unless an appropriation has been previously made for such purpose, or unless authorized by law.

"Section 5. All bills, vouchers, statements of claims or other evidences of indebtedness against the State, for any money appropriated herein, shall be filed with the State Auditor before warrants are drawn for the payment thereof.

* * * * *

"Approved March 11th, 1897." (Emphasis added.)

The Regents accepted the appropriation and, we may assume, expended it without protest. No objection was made that the Legislature *was powerless* to tell the Regents what salaries might be paid. No objection was made to the directive to the Auditor to recover into the State Treasury all unexpended balance of appropriations made by the first State Legislature for the year 1896. No objection was made to the declaration contained in Section 3, that no ·State officer or *State board of any institution* of the State should incur or contract for any indebtedness in excess. of the. appropriations therein provided, *except* by and with the consent of the State Board of Ex-

434

aminers previous to incurring or contracting for any such indebtedness.

The Regents in 1897 didn't contend that they were not State officers, nor did they contend that their right to incur indebtedness was a right granted them by the Constitution and beyond the power of the Legislature to interfere with.

In those early days the Regents were not disposed to tell the Legislature to leave them alone. They weren't taking any chance on offending Santa Claus.

Chapter 5, Laws of Utah 1899 provided for removal of the University to the establishment on the site granted by Congress. It authorized and directed the Regents to expend $200,000, or so much thereof as necessary to plat the grounds, procure plans, erect necessary buildings, equip and furnish the same and to do all other acts and things necessary to establish the University of Utah on those certain premises granted by the Congress of the United States to the University of Utah.

The act authorized and directed the State Board of Land Commissioners, "to speedily convert sufficient investments of the university of Utah permanent land fund into cash, and at once to pay the same, as well as all cash on hand or that may hereafter be received, belonging to such fund, to the regents of the university of Utah, until such payments equal one hundred thousand dollars." The Legislature appropriated an additional $100,000 for the purpose set out in the act.

The act further provided that as soon as the University of Utah is permanently located on the site granted by Congress, the lands and buildings "now owned and occupied by the university of Utah for educational purposes, shall be duly conveyed to the state of Utah"; and thereupon the State Board of Land Commissioners was directed to take charge and possession of said lands and buildings until the premises could be sold and then sell the same and credit the proceeds of the sale on the obligation of the Regents to the State Board of Land Commissioners for the loan of the $100,000 mentioned.

The Regents in 1899 did not protest against being required to turn the old university site over to the Board of Land Commissioners. They did not then contend that the land and buildings belonged to the University free from any control by the Legislature.

Chapter 135, Laws of Utah 1901 provided for appropriations for the succeeding biennium. The act appropriated $75,000 to the University of Utah for general maintenance for two years, including State School of Mines and the State Normal School. It also appropriated all the interest on the permanent land fund of the University Mining School, and State Normal School that was on hand. It also appropriated $57,000 for a School of Mines building, and heating, plumbing, and furnishings for ensuing two years. It provided in Section 3:

"It shall be unlawful for any state officer or state board of any institution

in the state to incur or contract for any indebtedness in excess of the appropriations herein provided, *except by and with the consent of the state board of examiners,* previous to incurring or contracting for any such indebtedness."

It provided in Section 5:

"All bills, vouchers, statements of claims or other evidences of indebtedness against the state, for any money appropriated herein, shall be filed with the State Auditor before the warrants are drawn for the payment thereof."

Chapter 37, Laws of Utah 1897 required approval by the Board of Examiners before the income from land grant funds could be withdrawn from the treasury and used by the University.

On January 2, 1897 the Board of Regents of the University of Utah made report for the year 1896.[11] The report was addressed to the Governor and Legislative Assembly of the State of Utah. It stated:

"The last report made by this Board contained a full statement of the deficit that had been incurred to meet the operating expenses of the school, and the action of the Board in borrowing the sum of Sixteen Thousand Dollars from its land fund account was duly announced. *An appropriation was asked* to make good this deficit and to repay the land fund loan. The Governor recommended such appropriation, and the Legislative Assembly of 1896 appropri-

ated to the University with the view of covering the amount of the deficit, and of supplying means for the maintenance of the institution during the calendar year, 1896. By an error in calculation, however, only $13,500 was given toward the $16,000 debt. *Since the adjournment of the last session of the Legislature, the University Land Fund has been transferred from the custody of the Regents to that of the State Board of Land Commissioners, in accordance with the provisions of law; and the amount of the difference between the actual deficit and the appropriation made to meet said deficit, or $2,500 has been taken from the maintenance fund provided for 1896."* (Emphasis added.)

The recapitulation of the request was as follows:

"Recapitulation

"We present here a summary of the needs of the University, to meet which appropriations are asked:

"1. For the unexpired part of the current academic year, 1896–97:

| | |
|---|---|
| To meet deficit incurred with the sanction of the State Board of Examiners | $ 3,200.00 |
| For maintenance until June 30, 1897 | $24,050.00 |
| Total | $27,250.00 |

"For this an appropriation immediately available is needed, or the expense of interest on money to be borrowed should be added.

11. Public Documents 1896.

436

"2. For the biennial period covered by the academic years, 1897–98 and 1898–99:

| | |
|---|---:|
| Maintenance on present basis of expenditure to which add $6,000 per year for additions to the instructing force, in all | $ 92,000.00 |
| Library | $ 7,500.00 |
| Museum | $ 1,000.00 |
| Apparatus and supplies for departments and courses connected with the Mining School | $ 4,000.00 |
| Normal School: establishment and maintenance of Kindergarten Department | $ 3,500.00 |
| Training School and Manual Training Department and Gymnasium equipment in connection with Normal School | $ 3,500.00 |
| Alterations and additions to adapt buildings for use as laboratories per Architect's statement | $ 1,750.00 |
| Such additions and improvements as are indispensable in buildings and grounds on University Square | $ 12,000.00 |
| Total | $125,250.00" |

(Emphasis added.)

There was nothing in the report and request of the Regents in January, 1897 indicating any contention that they were not subject to control of the Legislature or that the powers given the Board of Examiners were an infringement of their constitutional rights. Every biennium since statehood the Legislature has seen fit to grant the University, and the University has seen fit to accept substantial sums of money from the general tax funds of the State. In the last 15 years alone the appropriation from the general fund to support and maintain the University in the style to which it has become accustomed has amounted to over 34 million dollars. In addition, the University has grown since statehood from three build-ings in the center of Salt Lake City to a physical plant worth the sum of $18,542,095 as reflected by the June 30, 1952 balance sheet of the University; and since 1952 the Legislature has seen fit to grant the University an additional two million dollars for building purposes.

The Regents, officials and personnel of the University in the early years after statehood were indeed grateful for the beneficence of those early legislatures, during which time appropriations for buildings, new schools and enlarged teaching staffs were made, without which the University would have failed to attain the eminence it now enjoys. The University enjoyed and thrived on its dependence on the Legislature, but lately it seeks a change. It chooses to declare that independence, which the institution never has had, and which has never, prior to the bringing of this action, been asserted. After these 50 years of acquiescence it is difficult to understand this sudden quest for independent control.

The people of Utah are proud of the great progress made by the University; its history and attainment are a glowing tribute to the Regents, the Presidents and the Faculties that have guided it along its glorious course as well as to its donors and the 30 legislatures that have furnished the funds to assure its growth. Nor is there anything made to appear which should cause alarm or concern to any. It must be conceded that had its Regents in those early years asserted its independence from the Legislature, it is doubtful that it would have attained a stat-

ure which would induce it to declare its independence.

Nothing in the arguments and debates in the Constitutional Convention on the education article, (X) and more particularly, on Section 4, tends to suggest that it was considered by the delegates that the Legislature by said article would be prohibited from acting in respect to the University, except in matters of location and establishment.

The entire thought of the convention in respect to the University and Agricultural College was on the question of uniting them or leaving them separate, and on the question of location. All delegates were aware of the problem as the 1894 Legislative Assembly had discussed the matter.[12] At the suggestion of the Governor a bill was introduced in the 1894 Legislative Assembly to join the two institutions and locate the new University at Salt Lake City. In the convention the professional educators, including Dr. William Jasper Kerr, and Dr. Karl G. Maeser, delegates to the convention, and Dr. James E. Talmage, invited to express his views, supported consolidation on the ground of efficiency and economy. Some argued that the whole matter should be left with the Legislature. This view was voiced by the following delegates: Snow, Goodwin, Richards, Varian, and Chidester.

Opponents of consolidation argued that agricultural subjects would be overshadowed by classical subjects if the schools were united; that the State's investment in the buildings and grounds at the Agricultural College would be wasted, that the State was able to support two colleges, and that all public institutions should not be centralized in Salt Lake City. This view was expressed by delegates Ricks, Squires, Thorsen, Preston and Roberts.

When an amendment to Section 4 was proposed which made it read as finally adopted, the whole purpose of the amendment was as suggested by Mr. B. H. Roberts, who proposed it:

> [With this amendment] * * * "we shall say that the university and agricultural college as established by existing laws is hereby confirmed; that is, the location of the university and agricultural college is hereby confirmed."[13]

A clear expression of Mr. Roberts' intent in connection with (Article X) Section 4 will be found on page 1286 of the Convention Proceedings, wherein he advocated the adoption of an amendment relating to the establishment of branches of the State Normal School at locations elsewhere than the main school at the University:

> "* * * so that the Legislature would *only* be restricted in these matters of educational affairs *to remove* the agricultural college and the main department of the university from the

---

12. 1894 House Journal, pp. 16 and 463.

13. II Constitutional Convention Proceedings, p. 1266.

438

location that this convention may give them. * * *" (Emphasis added.)

Nowhere in the proceedings can an expression of intent be found that the Legislature should forever be prohibited from acting in any matters dealing with the purposes and government of the University except its establishment and location.

Chapter 104, Laws of Utah 1905 created a commission to investigate the work of the Agricultural College of Utah and of the University of Utah. The commission was charged with the duty of investigating thoroughly the duplication of work in the Agricultural College of Utah and the University of Utah; of ascertaining the cost of such duplication and to consider the advisability *of submitting* to the electors of this State *an amendment to Section 4, Article X of the Constitution* of the State of Utah providing for the consolidation of said Agricultural College of Utah and said University of Utah.

The Legislature in 1905, nine years after the Constitution was adopted, interpreted Section 4, Article X as prohibiting interference with the location of the two institutions mentioned in said section.

There is no indication that any Legislature from 1896 to 1905 entertained the slightest doubt that the University was subject to legislative control as to its purposes and government. But the 1905 Legislature did give a practical construction to said Section 4, as limiting the Legislature *only* to interfering with the location and establishment of the two institutions.

Counsel for respondent have failed to call to our attention any protest in the press, by resolution or otherwise against the legislation complained of by respondent as being in violation of the constitutional rights of the University.

Constitutional lawyers, including George Sutherland, late Justice of the Supreme Court of the United States, did not feel restrained by Article X, Section 4. The bill bearing the title, "An Act relating to the University of Utah, Providing for its Powers and Government, the Selection, Powers and Duties of its Officers, Authorizing and Regulating Endowments thereof and Repealing all prior Inconsistent Laws" was first introduced in the Utah Senate by George Sutherland.[14] The bill as finally enacted became Chapter 83, Laws of Utah 1896, which was stipulated by counsel as being a re-enactment of Chapter IX, Territorial Laws of 1892, and which declared that the University should be subject to the laws of this State from time to time enacted relating to its purposes and government.

Senator Sutherland was not restrained by Section 4, Article X. He did not consider the University above the Legislature, but with 11 members of the 1896 Legislature who had been members of the Constitutional Convention, recognized that the

14. Senate Journal 1896, p. 195.

University was subject to the laws of this State from time to time enacted.

Let us consider the result were we to accept respondent's contention. The University contends and the trial court held that the State of Utah, including the Legislature, Board of Examiners, Finance Department and the other named defendants have no control, check or audit of the money used by the University, whether appropriated funds or dedicated funds; that the University is entitled to keep the same in its own bank and expend it free from any review or control, except post audit (but post audits are valuable only as a matter of history); that the Regents of the University may authorize out of state travel for University employees and pay the same without previous approval therefor by the Board of Examiners (yet the Governor, Secretary of State, Attorney General and all other state officers must obtain such previous approval); that the University is not subject to laws enacted by the Legislature, and the statutes so declaring are unconstitutional; that the University is authorized to draw from the Treasurer of the State of Utah quarter yearly in advance its biennial legislative appropriations for maintenance, whereas, all other legislative appropriations may be procured only after pre-audit and approval of some or all of the defendants; that the University may retain all unexpended surpluses from all funds, and that the Legislature has no power to order such surpluses closed out, and that any condition attached to appropriations to the University restricting the powers of the Board of Regents are unconstitutional and void; that the University is empowered to carry out its own building and expansion program without any control or supervision on the part of the State Building Board. In short, the University and its Board of Regents contend that they have been given a blank check enabling them to expend all funds without any semblance of supervision or control.

Article X, Section 1 of our Constitution provides:

"The Legislature shall provide for the establishment and *maintenance* of a uniform system of public schools, which shall be open to all children of the State, and be free from sectarian control." (Emphasis added.)

Article X, Section 2 of our Constitution declares:

"The public school system shall include kindergarten schools; common schools, consisting of primary and grammar grades; high schools, an agricultural college; a university, and such other schools as the Legislature may establish. The common schools shall be free. The other departments of the system shall be supported as provided by law. * * *"

Would it be contended by the University that under Article X, Section 1 it might compel the Legislature to appropriate money the University considers essential?

Is it contended that the demands of the University·are not subject to constitutional debt· limits? If so, respondent would have the power to destroy the solvency of the State and all other institutions by demands beyond the power of the State to meet.

Article X, Section 5 provides:

"The proceeds of the sale of lands reserved by an Act of Congress, approved February 21st, 1855, for the establishment of the University of Utah, and of all the lands granted by an Act of Congress, approved July 16th, 1894, shall constitute permanent funds, to be safely invested and held by the State; and the income thereof shall be used exclusively for the support and maintenance of the different institutions and colleges, respectively, in accordance with the requirements and conditions of said acts of Congress."

Article X, Section 7 of our Constitution declares:

"All public School Funds shall be guaranteed by the State against loss or diversion."

It is inconceivable that the framers of the Constitution in light of the provisions of Sections 1, 5 and 7 of Article X, and the provision as to debt limitations, intended to place the University above the only controls available ·for the people of this State as to the property, management and government of the University. We are unable to reconcile respondent's position that the University has a blank check as to all its funds with no pre-audit and no restraint under the provisions of the Constitution requiring the State to safely invest and hold the dedicated funds and making the State guarantor of the public school funds against loss or diversion. To hold that respondent has free and uncontrolled custody and use of its property and funds, while making the State guarantee said funds against loss or diversion is inconceivable. We believe that the framers of the Constitution intended no such result.

Appellants and respondent agree that the interpretation which we put on Article X, Section 4 will determine the other questions presented. It has not been urged by respondent that if the University is subject to legislative control that any of the enactments complained of are invalid. Respondent's objection is that the Legislature had no power to confer on the Boards, Commissions and Officers the authority to supervise and control the University. ·Since no complaint is made against the defendants named, except that the duties being performed by them are in violation of respondent's constitutional rights because the Legislature could not legally invest said defendant with authority to infringe upon the rights secured by the Constitution, it must follow that the objections ·of respondent as to the acts complained of must fall by reason of the conclusion reached herein; that the University is a public corporation not above the power of the Legislature to control, and is subject

to the laws of this State from time to time enacted relating to its purposes and government.

The judgment is reversed and remanded with directions to set aside the judgment entered and to enter a declaratory judgment in favor of the defendants in accordance with the opinions herein expressed, the respective parties to bear their own costs.

McDONOUGH, C. J., concurs in result.

HENRIOD, J., concurs in result.

WADE, J., concurs subject to limitations as expressed in the opinion of CROCKETT, J.

CROCKETT, Justice.

I concur in the opinion of Justice WORTHEN, adding this comment: It appears to have been the purpose of the constitutional founders to continue the University as a public corporation permanently. Except to the extent stated below, I do not believe that the problems now confronting us require any further refinement upon the contention of the University that it is "a constitutional corporation, the highest form of juristic person known to the law, except the state itself * * *." [1]

It would undoubtedly require a change in the Constitution to abolish the University or to change substantially its nature or function. With respect to its corporate status and existence, it is beyond the power of legislative control. The importance and desirability of a high degree of independence of internal function, and of academic freedom, was unquestionably recognized by the founders. We are not here concerned with any question of interference with the corporate existence or the operation of the institution in any manner that would substantially alter its function as a university. A different question would arise should the legislature deliberately attempt to do so, or act so capriciously or arbitrarily with respect to appropriations or budgetary matters that such would be the effect of its action. Fortunately, we are not faced with any such problem, nor does anything here confronting us give rise to any apprehension that we will be.

Under the present statutes and regulations about which the University is concerned, the question is whether that institution is subject to the general legislative control and budgetary supervision as are other departments of state government. Insofar as this case deals with the latter question, I agree that the University is subject to such control whether it be regarded as a "constitutional corporation" or otherwise. Assuming that it is a constitutional corporation, it does not necessarily follow that it is as completely free

1. Respondent's brief, pp. 5 and 37; similar language used by Mich. Court, Board of Regents of University of Michigan v. Auditor General, 167 Mich. 444, 132 N. W. 1037.

442

from legislative control as the University here contends. Its powers are still to be found in, and circumscribed by, the language by which it is created. The nature of the University as a legal entity is rooted in the constitutional language: "The location and establishment *by existing laws* of the University of Utah, * * * are hereby confirmed, and all rights, immunities, franchises and endowments heretofore granted or conferred, are hereby perpetuated unto said University * * *."[2] which indeed fixes its right to corporate *existence* in the Constitution. But its creation is qualified by the phrase "by existing laws." *The existing laws* upon which its constitutional origin was based in turn recited that it was a "public corporation and [to] be subject *to the laws of Utah, from time to time enacted,* relating to its purposes and government,"[3] which seems to indicate clearly that it was subject to control by the territorial legislature, and consequently by the state legislature.

2. Article X, Section 4, Utah Constitution.

3. Sec. 1, Ch. IX, L. of Utah 1892, Now 53-31-2, U.C.A.1953.